UNITED STATES of America, Appellee,

v.

Eddie Lee ANDERSON a/k/a Brian McKnight, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Michelle COUTERMARSH, Defendant, Appellant.

Nos. 96–1635, 96–1738.

United States Court of Appeals, First Circuit.

Heard Feb. 2, 1998.

Decided March 27, 1998.

---

John C. McBride, Marblehead, MA, with whom McBride & Associates was on brief, for appellant, Eddie Lee Anderson.

Susan K. Howards, with whom Launie and Howards, P.A., Boston, MA, was on brief, for appellant Michelle Coutermarsh.

Jeanne M. Kempthorne, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

Appellants Eddie Lee Anderson and Michelle Coutermarsh were each convicted in the district court of three counts involving transportation of minors and other individuals across state lines for purposes of illegal sexual activity—prostitution. 18 U.S.C.A. §§ 2421, 2423(a) (West Supp.1998). They bring separate appeals, which we have consolidated for purposes of argument and opinion. We address their individual arguments first, before turning to the positions common to both appellants. We affirm both convictions and sentences.

As is required, "we sketch the facts in the light most favorable to the jury verdict, consistent with record support." *United States v. Pitrone*, 115 F.3d 1, 3 (1st Cir.1997). For a number of years, Anderson and Coutermarsh operated a prostitution business that involved both juvenile and adult women. The center of these operations during the offense conduct was Dracut and Lowell, Massachusetts, where Anderson and Coutermarsh each had separate households. At the time of the offenses charged, the organization included adult prostitutes Coutermarsh, Kelly Munger, Inez Walsh, and juveniles Christy, Jasmine, and Jessica.[1] Anderson and Coutermarsh were assisted in their activities by Norris Scott, who basically ran errands for Anderson. Scott, who was included in the indictment, pled guilty before trial.

Anderson received all of the prostitutes' earnings, in exchange for which the women and girls were given food, clothing, shelter, and drugs. Each prostitute was identified by a gold name tag necklace, and each had been given Massachusetts identification cards—with false names and birth dates—which were obtained by Anderson through a connection at the local Registry of Motor Vehicles. These identification cards gave the juveniles access to establishments from which they would otherwise have been excluded because of their ages.

The charges at issue stem from two trips made from Lowell, Massachusetts, to Atlantic City, New Jersey, in February, 1995. On or about February 21, 1995, Anderson and Scott left the Lowell area with two adult women and two juveniles, Jasmine and Jessica. The group traveled in three cars—Anderson's Mercedes, Coutermarsh's Acura, and a rental car. While they were bound initially for Atlantic City, the group apparently planned to continue on to Las Vegas, Nevada, at some later date. Coutermarsh stayed in Massachusetts, ostensibly to arrange for the transportation of her and Anderson's belongings to Nevada.

Upon arrival in New Jersey, the group housed themselves at the Luxury Inn in Absecon.[2] Norris Scott rented the rooms under an alias. Anderson and Scott obtained beepers for the women and juveniles, and listed them with local escort services. The prostitutes began to work what is known as "The Track" in Atlantic City—an area where sex was sold. Several days after arrival, on or about February 25, 1995, Anderson and Scott returned to Massachusetts with the juvenile Jessica, in order to head off a possible kidnapping charge by assuaging Jessica's family with false information about her activities and whereabouts. After Anderson's meeting with Jessica and her aunt, Coutermarsh drove Jessica into Boston for prostitution and in the early morning hours of February 26, 1995, put her on a train back to New Jersey. Jessica testified that Coutermarsh paid for the ticket with cash that Anderson had given her.

It was not long thereafter that things began to go awry for Anderson and his organi-

---

1. As shall be explained *infra*, only the first names of the juveniles are used. *See* 18 U.S.C.A. § 3509, generally. We also note that although each of these individuals had at least one "street name," or alias, we use only real names here in order to avoid confusion.

2. Absecon is directly adjacent to Atlantic City.

zation. To make the short of it, automobiles were impounded by the authorities and some of the prostitutes were arrested. This was followed by the arrests of Anderson, Scott, and Coutermarsh.

## I

### A

We examine Anderson's independent positions on appeal first. Anderson initially appeals the district court's denial of his motion for a new trial, which we review for "manifest abuse of discretion." *United States v. Brimage*, 115 F.3d 73, 79 (1st Cir.), *cert. denied*, — U.S. ——, 118 S.Ct. 321, 139 L.Ed.2d 248 (1997). The motion below was brought on the basis of "newly discovered evidence," allegedly withheld by the government in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Anderson posits that the evidence demonstrates government inducements to juvenile witnesses Christy and Jessica in exchange for their testimony against Anderson.[3] Had he been privy to this information, Anderson argues, his ability to impeach these key witnesses would have been substantially improved. While we have suggested that newly discovered impeachment evidence might in some circumstances warrant a new trial, *see United States v. Sepulveda*, 15 F.3d 1216, 1220 n. 5 (1st Cir.1993), we do not think that Anderson's offering meets the high standard required of him: "probably produc[ing] an acquittal upon retrial." *United States v. Ortiz*, 23 F.3d 21, 27 (1st Cir.1994).

Anderson directs us to two bits of evidence to substantiate his claim: (1) a notation in Coutermarsh's Presentence Report ("PSR") that Christy and her father were critical of the government because "[b]oth were of the opinion that if Christy cooperated in the investigation, agents would assist her in securing employment," Coutermarsh PSR ¶ 30, Coutermarsh App. at 76; and (2) the fact that Jessica had a Child In Need of Services ("CHINS") warrant outstanding at the time

she testified. From these threads Anderson argues that it can be inferred that inducements were offered to the juveniles to testify for the government, and were accepted. There is no evidence to support what are, at the most, suspicions. Moreover, there is such a lack of developed argumentation on appeal as to warrant a finding of waiver. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990).

We need not recite all the familiar requirements that a defendant must meet in order to prevail on a motion such as this. *See Ortiz*, 23 F.3d at 27. It is enough to reiterate that "new trials based on newly discovered evidence, or on evidence withheld by the prosecution, require specified showings as to the likelihood of a different result." *Sepulveda*, 15 F.3d at 1219.

Anderson's claim fails because he has not even attempted to demonstrate how such proof would warrant a new trial. Even assuming, arguendo, that Christy and her father thought that some benefit would accrue as a result of her testimony, we do not think that inclusion of such evidence would probably produce an acquittal the next time around. Christy was not one of the juveniles transported to New Jersey, and her testimony was largely background information which set the stage for the offense conduct. Our examination of the record leads us to conclude that the verdict would stand even without Christy's testimony. Similarly, the mere fact of an outstanding CHINS warrant, without more, does little to alter the legitimacy of Jessica's testimony. After our review of the record we find that the district court was correct when it determined that, "[t]his so-called new evidence, ... even when considered cumulatively, is insufficient to undermine confidence in the verdict." *United States v. Anderson*, No. 95–10110–PBS, slip op. at 8 (D.Mass. May 8, 1996).

### B

Anderson's next argument fares no better. Referring us to *United States v.*

---

**3.** In his original motion, Anderson also argued that the government failed to provide a list of (1) all pending charges against government witnesses, and (2) the benefits that might accrue to

the witnesses with regard to those charges should the witnesses agree to cooperate. He has not pursued this avenue on appeal.

*Pion*, 25 F.3d 18, 22–24 (1st Cir.1994), Anderson contends that he was denied his right under the Sixth Amendment to be tried by a jury drawn from a representative cross section of the community. During the jury selection process, Anderson, who is African-American, objected to the fact that only one individual in the jury pool was of his race. He suggests that such an "unconstitutionally disproportionate" jury pool mandates reversal of the jury's verdict.

This constitutional claim cannot rest on racial disproportion without more. The defendant also must show that the "underrepresentation is due to *systematic exclusion* of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979) (emphasis added). Anderson does not even attempt to make such a showing here, and therefore his claim fails.

## C

■ Anderson next argues that the district court was incorrect to apply enhancements at sentencing to his base offense level for (1) supervisory role in the offense, (2) coercion, and (3) obstruction of justice. He does not contend that any legal error transpired. In such instances, "appellate review must be conducted with considerable deference. Absent an error of law ... the sentencing court's determinations are to be set aside only for clear error." *United States v. Cruz*, 120 F.3d 1, 3 (1st Cir.1997) (en banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 729, 139 L.Ed.2d 667 (1998). As to all three assignments of error, Anderson only suggests that the government failed in its obligation to prove his qualification for the enhancements by a preponderance of the evidence. *Id.* We disagree.

■ We begin with the supervisory role in the offense enhancement. The district court enhanced Anderson's base offense level under U.S.S.G. § 3B1.1 because it was satisfied that Anderson was a manager, supervisor, and organizer of an otherwise extensive crim-

inal activity. Memorandum of Sentencing App. at 2, Anderson App. at 50. Judge Saris found that although she did not have five or more "participants" for purposes of the enhancement, she did have sufficient evidence that the scheme was "otherwise extensive."

We have held that the "determination that a criminal activity is 'extensive' within the meaning of section 3B1.1 derives from 'the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme.' " *United States v. Rostoff*, 53 F.3d 398, 414 (1st Cir.1995) (quoting *United States v. Dietz*, 950 F.2d 50, 53 (1st Cir.1991)). The record facts here support the district court's decision. A significant number of women were under Anderson's control—one witness testified at sentencing that the number was eight. Anderson utilized the services of several other individuals (in two states) in pursuit of his activities, *see United States v. D'Andrea*, 107 F.3d 949, 957 (1st Cir.1997), and his plans involved, at a minimum, transportation of individuals for prostitution in three states. On this record, we can only say that Judge Saris was well within the boundaries of U.S.S.G. § 3B1.1 when she found Anderson's prostitution ring to be "otherwise extensive."

■ Any attempt by Anderson to challenge the district court's finding that he was the supervisor or manager of the enterprise is futile in the face of the evidence. He received all the earnings of the women and girls, and there was more than sufficient unrebutted testimony for the district court to find that he directed their activities at all times relevant to the offenses.

■ The district court also enhanced Anderson's base offense level because it found evidence of coercive conduct with regard to one of the juvenile prostitutes. U.S.S.G. § 2G1.2(b)(1).[4] Judge Saris found that,

> [w]hile there was no physical force used to induce these girls to go to New Jersey,

---

4. This section of the guidelines has since been deleted, and the provision fused with U.S.S.G. § 2G1.1. No substantive change was affected by the clarification, which was accomplished "in

furtherance of the Commission's goal of simplifying the operation of the guidelines." Amendment 538, U.S.S.G. Appendix C, at 376.

with respect to Jasmine, I find by a preponderance of the evidence that there was "coercion", which "includes any form of conduct that negates the voluntariness of the behavior of the person transported." § 2G1.2, Application note 3. While I agree with defense counsel that one motivating factor in taking the trip to New Jersey was Jasmine's fear of losing Jessica, I also find that a substantial motivating factor was defendant's coercive behavior to her. In particular, I rely on the following three factors. First, he had within the previous week raped her when she said no to sexual intercourse. Second, he gave the girls approximately an ounce of marijuana daily. Jasmine testified that she was almost always high, including on the trip to New Jersey, and told the probation officer that she could not have engaged in the prostitution activities if she had not been high. The guidelines say that coercion can result where the ability of the person being transported to control or appraise conduct was substantially impaired by drugs. Application note 3. Third, Anderson accompanied the car driven by Jasmine in a caravan to New Jersey.

Memorandum of Sentencing App. at 2–3, Anderson App. at 50–51. The findings of the district court are well borne out by the record.

██ Anderson suggests that because Jasmine testified that she was "not forced" to go to New Jersey, the coercion enhancement should not apply. Coercion, however, has a more complex meaning than Anderson acknowledges. "[C]oercion must at a minimum involve, conceptually speaking, an impending threat of some negative consequence that will affirmatively befall a person if he or she does not succumb to the pressure that is being exerted." *United States v. Sabatino*, 943 F.2d 94, 104 (1st Cir.1991). Jasmine was undoubtedly under Anderson's control when she went to New Jersey. Anderson consistently supplied her with an amount of mari-

juana which was sufficient to impair her voluntariness. And Anderson forcefully raped Jasmine just one week before leaving for New Jersey when Jasmine refused to have sex with him. This rape impressed on Jasmine Anderson's power over her. The record also demonstrates that Jasmine knew that bad things happened to those who crossed Anderson. Jessica testified at sentencing that although she did not want to make the journey, Anderson "wanted his girls to go," Anderson Disp. I, at 108, and she went. The record clearly establishes coercion of Jasmine by Anderson sufficient for the enhancement.

██ Finally, Anderson disputes the district court's decision to enhance his base offense level because of his attempted obstruction of justice. U.S.S.G. § 3C1.1. The district court determined that,

[a]fter evaluating the credibility of Jessica, one of the juvenile victims, at trial, and at the sentencing hearing, I find her testimony credible that defendant's son, a school friend, gave her money ($3500) to sign an affidavit on defendant's behalf retracting her accusations, and a bus ticket to prevent her from testifying. I further find that defendant instructed his son to tamper with this witness.

Memorandum of Sentencing App. at 1, Anderson App. at 49. The record contains a preponderance of evidence to support the enhancement.[5]

## II

### A

██ Appellant Coutermarsh's first attack is against the district court's decision to depart upwards under U.S.S.G. § 3B1.1 for her supervisory or managerial role in the offense. Judge Saris acknowledged that she could not enhance Coutermarsh's sentence under U.S.S.G. § 3B1.1 because none of the other prostitutes were "participants" in the

---

5. Anderson also argues in his reply brief that it was error for the district court to apply the obstruction of justice enhancement to his total base offense level because only one juvenile victim was urged to alter her testimony. The district court was correct, however, that "Jessica

had information with respect to all the victims and the obstruction of justice affected the entire investigation." Memorandum of Sentencing App. at 1, Anderson App. at 49. There was no error.

transportation offense itself. *See United States v. Jarrett,* 956 F.2d 864, 868 (8th Cir.1992). She based her decision to depart upwards by two levels on U.S.S.G. § 3B1.1 comment 2, which allows departures "in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." We review sentencing departures for abuse of discretion. *Koon v. United States,* 518 U.S. 81, 96–100, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996). Coutermarsh does not contend that it was legal error for the district court to depart—nor could she, *see United States v. Cali,* 87 F.3d 571, 580–81 (1st Cir. 1996)—just that the record facts do not support the decision.

Judge Saris specifically found a departure "warranted, with respect to the Jessica grouping only, because Coutermarsh exercised supervisory/management responsibility over Jessica's prostitution activities, and over one aspect of her inter-state transportation." Memorandum of Sentencing App. at 2, Coutermarsh App. at 113. We fail to see any abuse of discretion, given the evidence supporting the decision. *See Koon,* 518 U.S. at 96–100, 116 S.Ct. at 2046–47. Jessica testified at trial that Coutermarsh "was basically telling me how to make the money, you know, how to act when I was out there," Tr. III at 25, and that before leaving for Atlantic City Coutermarsh instructed Jessica on "what casino to go to and ... what to do in casinos to attract dates and how to get them," *id.* at 47. Jessica also testified that after a night of prostitution in Boston, just before being sent back to Atlantic City, she "told [Coutermarsh] I was real sick, but she told me she knew how sick I was, but I had to bring some money home." *Id.* at 60. It was the following morning that, as Jessica stated, Coutermarsh "bought my train ticket" and instructed her on what to do when she arrived in New Jersey. *Id.* at 61. We do not think these facts are, as Coutermarsh suggests, legally insufficient to support the departure. We have upheld an enhancement under this section when " 'a defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person.' " *United States v. Voccola,* 99 F.3d 37, 44 (1st Cir.1996) (quoting *United States v. Savoie,* 985 F.2d 612, 616 (1st Cir.1993)). And, as required, we are highly deferential to the departing court's factual determinations under the abuse of discretion standard. *Koon,* 518 U.S. at 96–98, 116 S.Ct. at 2046.

Coutermarsh argues that Jessica is simply not to be believed. To be sure, inconsistencies were revealed in Jessica's testimony during cross-examination. A witness's veracity, however, can be debated for the legal equivalent of eternity, and some record support for a contention of untruthfulness can usually be found. This is precisely the reason why, "[i]n the sentencing phase, credibility determinations lie within the domain of the district court. Only rarely—and in the most urgent circumstances—will we, from the vista of a sterile appellate record, meddle in such matters." *United States v. St. Cyr,* 977 F.2d 698, 706 (1st Cir.1992). No such rare urgency exists here.

## B

Coutermarsh's next assignment of error concerns the district court's decision not to depart; downward on the basis of U.S.S.G. §§ 5K2.13 (Diminished Capacity), and 5K2.12 (Coercion and Duress). Our task on this point is initially complicated by our need to determine whether Coutermarsh asserts a legal mistake or a claim that the district court unreasonably refused to depart on the facts presented. As we explained recently in *United States v. Saldana,* "a defendant may appeal from [her] sentence ... if it was imposed 'in violation of law' or by 'an incorrect application of the sentencing guidelines'; but the defendant may not appeal from a sentence within the guideline range if there was no legal error and the only claim is that the district court acted unreasonably in declining to depart." 109 F.3d 100, 102 (1st Cir.1997)(quoting 18 U.S.C. § 3742). Thus, if Coutermarsh is "present[ing] a claim of legal error, or at least a colorable claim," *id.* at 103 (emphasis in original omitted), we review it. Otherwise, if "the defendant's only claim on appeal [is] that, although the ·district court had understood its authority, it abused its

discretion in declining to depart .... [,] the government is within its rights to remind us that the abuse of discretion claim is not subject to review." *Id.*

■ There is no question with regard to the claim for departure on the basis of diminished capacity. Judge Saris based her decision on the results of a psychiatric evaluation, which she determined did not demonstrate enough diminished capacity for a downward departure. Because there is no suggestion of legal error, Coutermarsh's appeal on this claim is not reviewable.

■ Judge Saris's refusal to depart on the basis of coercion and duress is not so simply decided. Our task is muddied because Coutermarsh's counsel does not specifically address whether this is a claim of legal error. We, therefore, proceed with caution because the asserted claim could encompass such a mistake. We explain. The primary contention here is that Coutermarsh is an abused woman, who in a single past incident had been subject to physical violence perpetrated on her by Anderson. As a result of that past incident, her counsel at sentencing asserted that she remained in her relationship with Anderson under continuing coercion and duress, and thus is entitled to a departure on that basis.

Therefore, if Judge Saris had been concerned that a single past act of physical violence was insufficient *as a matter of law* to support a coercion/duress departure, our review as to that legal determination would, of course, be appropriate. *Koon*, 518 U.S. at 98–100, 116 S.Ct. at 2047. Our evaluation of the sentencing transcript, however, convinces us that this was not the case. Judge Saris did not imply that the past violence was legally insufficient for a departure. Indeed, she recognized that evidence of such violence was "helpful to [Coutermarsh]." Disp. Tr. at 51. She denied the downward departure because she found no evidence of the coercive *effect* of that violence during what she considered to be the relevant time period. Disp. Tr. at 60. She further expressed her reluctance to depart on the basis of information whose source was not subject to any cross-examination, or other evidentiary filters. We think this demonstrates that her decision

rested on the evidence's lack of persuasive effect and did not encompass any legal error. As a result, we are not at liberty to disturb her discretionary determination.

■ Coutermarsh also suggests that Judge Saris committed plain error for refusing to depart on the basis of *United States v. Rivera*, 994 F.2d 942 (1st Cir.1993), which held that "the sentencing court is free to consider, in an unusual case, whether or not the factors that make it unusual (which remove it from the heartland) are present in sufficient kind or degree to warrant a departure," *id.* at 949. Coutermarsh argues that her particular diminished capacity and coercive situation are so peculiar as to remove her case from the "heartland" of the standard diminished capacity and coercion departure provisions. The defendant has similarly failed to argue that there is any indication in the record that the district court misunderstood its legal authority to depart under the heartland analysis described in *Rivera*. As a result, we will not review this claim. *See, e.g., United States v. Boots*, 80 F.3d 580, 594 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 263, 136 L.Ed.2d 188 (1996) (refusing to review a district court's discretionary judgment that the case did not involve such unusual circumstances to justify taking it "outside the Guidelines' 'heartland' ").

### III

We now reach the two claims of error which are common to Anderson and Coutermarsh. Although the appellants have each briefed these questions separately, both claims concern alleged evidentiary trial errors which if unduly prejudicial to one defendant, would have been similarly unfair to the other. As such, we address them without much differentiation between the appellants.

### A

■ Appellants argue that the "admission" of certain phone records into evidence was improper and thus mandates a new trial. As an initial matter, no phone records were admitted into evidence. There was only testimony about phone records. The claimed

error finds its nexus in the government's re-direct examination of Atlantic City Police Detective Robert Clarke concerning the completeness of certain phone records relied on by one of the defendants during a previous cross-examination. Defendants claim that the district court erred in allowing this testimony because it went beyond the scope of the cross-examination, was not provided during discovery, and was more prejudicial than probative.

We set the stage. Jessica had testified during the third day of trial that at some point during her stay in Absecon, she telephoned her aunt from her room at the Luxury Inn. She also testified that Anderson and Norris had discovered her contacts with her family when they checked with the motel to see what calls were being made from the rooms they had rented. The next day, on the fourth day of trial, Anderson's counsel attempted to establish, through cross-examination of Atlantic City Police Detective Angelo Maimone, that Jessica was lying about calling her aunt from the Luxury Inn, and therefore her credibility was questionable.

Anderson's counsel elicited testimony from Detective Maimone that when Maimone reviewed some telephone records from the Luxury Inn, he did not see a record of any phone call being made to Massachusetts, nor did he see any record of any calls from the room that Jessica had occupied. Maimone testified that the F.B.I. had obtained the records, and that he had reviewed them in the course of his own investigation. Anderson's counsel showed Maimone a copy of the records during the cross-examination, without having them entered into evidence. The government objected to the use of these copies without proper authentication, but the district court allowed the testimony because it mistakenly thought that the phone records were part of the materials that the government had released to Anderson during discovery. In fact, Anderson's counsel had obtained the copies from Anderson's New Jersey lawyers, where a state prosecution was also moving forward. The government received a copy of the records from Anderson's counsel af-

ter the close of evidence on that fourth day, and reviewed them.

The next morning, before the fifth day of testimony, the government renewed its objection to the defendant's use of the phone records testimony. In the process of the side-bar conference, it was explained to the district court that the phone records at issue had not been provided to the defendants by the federal prosecutor, but had actually come from another source. The district court recognized that it had been error to allow Anderson's counsel to show the copies to Detective Maimone without a proper authentication. It decided to correct the error by allowing the government to explain what the records actually were during its redirect examination of Detective Clarke, Detective Maimone having already returned to New Jersey. The district court took this action because it determined that "[t]here was an obvious problem raised ... which in the interest of justice needs to be addressed." Tr. V at 61.

Detective Clarke proceeded to testify that the F.B.I. had not obtained telephone records for the room in which Jessica had stayed, but only obtained records for three other rooms also rented by Anderson and Scott. The government was thus able to rebut the impeachment evidence by showing that the records relied on by Anderson's counsel could not prove that Jessica had not made any telephone calls to Massachusetts.

We fail to see how Detective Clarke's testimony unfairly prejudiced the defendants. The testimony weakened what might have been a successful assault on Jessica's credibility. That, of course, was exactly the point of the rebuttal. After all, "[v]irtually all evidence is prejudicial—if the truth be told, that is almost always why the proponent seeks to introduce it—but it is only *unfair* prejudice against which the law protects." *Pitrone*, 115 F.3d at 8. Further, the decision to admit the testimony through Detective Clarke was well within the district court's discretion under Fed.R.Evid. 611(a) and (b).

**B**

The final issue in these appeals concerns the conflict between the district court's

desire to protect from disclosure certain information concerning the two juvenile witnesses, and the defendants' Sixth Amendment rights to an effective cross-examination of them. As an initial matter, we dispose of a related issue with little merit. Relying on portions of the Victims' Protection and Rights Act, 18 U.S.C.A. § 3509(d)(3), Judge Saris ordered that, in order to protect their identity, the last names of the juvenile witnesses not be disclosed during the trial. Coutermarsh contends that this action lent impermissible credence to the two witnesses' testimony by setting them apart from the other witnesses at trial. The record, however, reveals that Judge Saris was careful to balance the defendants' rights with those of the juvenile witnesses. The courtroom was not closed, as authorized by the statute, *see* 18 U.S.C.A. § 3509(e), and the full names of the juvenile witnesses were properly disclosed to the jury pool during impanelment. We simply fail to see how this protective order somehow bolstered the government's case, perhaps because Coutermarsh makes no attempt to explain it to us. Because we can find nothing in the record to lend credence to Coutermarsh's theory, we shall move on to an argument with a little more substance.

Both appellants contend that they were denied their right to effective cross-examination by several of the district court's decisions restricting foray into (1) the juvenile witnesses' past commercial sexual histories, (2) the fact that one juvenile witness had a two-year-old child, and (3) certain information indicating bias. Before we examine each claim, we lay out the relevant legal framework.

 The Confrontation Clause of the Sixth Amendment ensures a criminal defendant the right to cross-examine witnesses. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). "Although the trial judge retains the traditional discretion to limit the scope of cross-examination, discretion in the area of bias evidence becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant." *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.

1982). We have a similar test with regard to the general area of a witness's truthfulness. Thus, "one factor to be considered is the extent to which the excluded question bears upon character traits that were otherwise sufficiently explored. The court need not permit unending excursions into each and every matter touching upon veracity if a reasonably complete picture has already been developed." *Id.* (quoting *United States v. Fortes*, 619 F.2d 108, 118 (1st Cir.1980)). In all, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

 What remains the crucial question throughout these claims is whether a "'minimum threshold of inquiry' [was] afforded a defendant in the cross examination of an adverse witness." *Brown v. Powell*, 975 F.2d 1, 5 (1st Cir.1992) (quoting *United States v. Jarabek*, 726 F.2d 889, 902 (1st Cir.1984)). In the usual case, if "the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivations of the witness," *Tracey*, 675 F.2d at 437, the constitutional "minimum threshold" is met. *See United States v. Carty*, 993 F.2d 1005, 1010 (1st Cir.1993). Finally, and perhaps most importantly here, "[t]o establish that the district court has abused its discretion, the defendant must show that the limitations imposed were clearly prejudicial." *United States v. Williams*, 985 F.2d 634, 639 (1st Cir.1993). It follows logically, therefore, that should an error be revealed, we may affirm the conviction if we are confident that it was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 681, 106 S.Ct. at 1436.

 As we stated, three potential constitutional violations have been brought to our attention by appellants. We address each in turn. The first argument is that the district court erred on the first day of trial when it

refused to allow evidence of commercial sexual activity by the juveniles that occurred both before and after the relevant time period. While Judge Saris explicitly stated that "there is going to be no [evidence of] conduct outside [the relevant period]," Tr. I at 127, she left specific exclusions to another day, stating that "I don't know enough about this case," *id.* She was clear that she was "going to have to deal with it as it comes," *id.* at 126, and left the door open for the possibility that "something pops up and there is a prior inconsistent statement," *id.* at 127. Coutermarsh does not, however, direct us to any specific exclusions. We are left, therefore, with only the question whether the general prohibition was constitutionally defective.

Coutermarsh argues that the excluded information would have been useful to impeach the juveniles' credibility. We fail to see how evidence of prostitution outside the offense conduct would have any probative value regarding the truthfulness of the two girls. Such a position seems to us to embody a particularly offensive form of stereotyping to which we are loath to give credence. Regardless, both witnesses' credibilities were thoroughly, and quite effectively, tested without the foray into their sexual history. Nor do we see how such evidence would have impeached the substantive testimony offered by the juveniles. The indictment alleged *transportation* of the minors for purposes of prostitution. Any propensity to engage in prostitution would have had no bearing on what the jury needed to find in order to reach a guilty verdict. As a result, there could be no unfair prejudice by excluding this immaterial information.

■ The next claim posits that the district court's failure to permit cross-examination on the fact that juvenile witness Jessica had a two-year-old child was constitutional error. At trial, Coutermarsh's counsel was seeking to discredit Jessica's assertion on direct that she called her aunt because she "missed her family." If, Coutermarsh's counsel reasoned, the government's direct

examination had elicited this statement, he should have been allowed to discredit her testimony by demonstrating that she had earlier abandoned her child and therefore could not have "missed her family." Judge Saris refused to allow this line of examination because its probative value was substantially outweighed by potential prejudice. *See* Tr. III at 103–05. We cannot say her decision violated either defendant's right to an effective cross-examination. Jessica's reasons for making the telephone call were of marginal relevance to begin with, and the rebuttal of such evidence for credibility purposes was just that much more tangential. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435. Dispositive is the fact that the record reveals that both defendants' attorneys were given ample room to impeach Jessica's credibility otherwise. *Tracey*, 675 F.2d at 437. We therefore find no error in this single limitation.

■ The final argument in this arsenal is advanced by Anderson alone and requires little discussion. Arguing that he was denied the right to cross-examine the juvenile witnesses with regard to promises and inducements, Anderson directs us to a portion of the transcript from day four of the trial. Those pages, however, detail the results of a side-bar instituted after Anderson's counsel objected to a certain line of questioning by the government. The government eventually backed off the inquiry, and approached the issue more permissibly. Although at one point in the colloquy Anderson's counsel expressed concern about "promises, rewards and inducements," Tr. IV at 99, there is nothing else in that portion of the record to suggest that either defendant was being estopped from pursuing a line of cross-examination. To the contrary, it was the government whose course of questioning was being corrected. If there is any substance to the argument elsewhere in the record, we have not been alerted to it, and it is therefore deemed waived. *Zannino*, 895 F.2d at 17.[6]

---

6. At oral argument, and at Anderson's disposition, the point was made that one of the juvenile witnesses had been staying in a hotel with a female police officer during the trial. This was done to provide the juvenile with an appropriate

chaperon in the absence of an adult family member. But without any evidence that her testimony was actually altered or prompted by the influence of the police officer—such as a prior

## IV

The convictions and sentences below are *affirmed.*

inconsistent statement—we see no reason to dis-

turb the jury's verdict.