USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2193

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOAO M. GOMES,

 Defendant, Appellant.
 ___________________

No. 97-2312

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JUVENAL QUADROS,

 Defendant, Appellant.
 ____________________

No. 97-2363

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JULIO SERPA,

 Defendant, Appellant.

 ____________________
 ____________________

No. 97-2432

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 JOSEPH SILVA,

 Defendant, Appellant.
 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 
 
 John C. McBride with whom McBride & Associates was on brief
for appellant Joao M. Gomes.
 Richard J. Fallon, by appointment of the court, for appellant
Juvenal Quadros.
 Robert R. Andrew, by appointment of the court, for appellant
Julio Serpa.
 Stephen B. Hrones, by appointment of the court, with whom
Hrones & Garrity was on brief for appellant Joseph Silva.
 Elizabeth D. Collery, Department of Justice, with whom
Donald K. Stern, United States Attorney, Michael J. Pelgro and
Robert L. Peabody, Assistant United States Attorneys, and Demetra
Lambros, Department of Justice, were on consolidated brief for the
United States.

May 27, 1999

 
 
 BOUDIN, Circuit Judge. On this appeal, four defendants--
Joseph Silva, Julio Serpa, Juvenal Quadros, and Joao Gomes--seek
review of their convictions for drug trafficking offenses or of
their sentences. The case arises out of a large-scale
investigation of drug dealing in and around Lowell, Massachusetts,
conducted from the late 1980s until August 1996. Because the
sufficiency of the evidence is not disputed, our description of the
background and the defendants' actions is abbreviated and focuses
upon the specific drug sales charged in the indictment and
involving these defendants.
 In April 1995, a cocaine dealer named Larry Madsen was
arrested for trying to sell cocaine to an undercover policeman and
agreed to cooperate with the Drug Enforcement Administration
("DEA"). In gathering information, Madsen patronized a Lowell bar
called the Colonial Lounge. There, he saw Silva selling small
quantities of cocaine to other patrons. Silva ultimately made a
sale of 25.7 grams of cocaine to Madsen on August 7, 1995. Silva's
defense at his later trial was that he had been badgered and
entrapped into making the sale.
 Gomes and Serpa were implicated through a different set
of transactions. In June 1995, Madsen approached Gomes and Serpa
at the same bar and asked to buy cocaine. Gomes, Serpa, or both
then made four sales to Madsen between June and August 1995; the
transactions were recorded on audio or videotape in whole or part,
and in two of them an undercover officer participated by posing as
Madsen's partner. In each of the sales, both Gomes and Serpa were
present for some part of the transaction: on three of the four
occasions, it was Serpa who handed over the drugs and on the fourth
Serpa was described by the police as a lookout or enforcer.
 The last defendant, Quadros, was identified by Madsen as
another seller of cocaine at the Colonial Lounge. Quadros made one
sale of cocaine to Madsen in August 1995. Quadros also introduced
Madsen to Alvin Santos, facilitating Santos' later sale of cocaine
to Madsen in March 1996. Quadros also acted as an intermediary in
a sale to Madsen by Jose Aguiar in May 1996; this sale, on which
Quadros' sentence turned, is described in more detail below.
 These were among many events that led to the indictment
of ten defendants, including the four who are parties to this
appeal. In a superseding indictment, all ten were charged with
participating in single conspiracy to possess with intent to
distribute and to distribute cocaine, 21 U.S.C. 846, but the
links between the defendants are not material here. Each of the
four defendants involved in this appeal was also charged with
distributing specific amounts of cocaine on specific dates, 21
U.S.C. 841(a)(1), and with other, related crimes (e.g., criminal
forfeiture, 21 U.S.C. 853; 18 U.S.C. 982, and money laundering,
18 U.S.C. 1956(a)(1)(B)(i)). 
 One of the ten defendants fled, and seven of the others
(including Quadros and Gomes) pled guilty to various charges,
including the conspiracy charge. At trial, Serpa was convicted on
all counts. At a separate trial, Silva was acquitted of
conspiracy, but the jury hung on the single distribution count
involving Silva. On retrial, Silva was convicted on the
distribution count. After sentencing, each of the four appealed. 
Serpa and Silva challenge their convictions while Quadros and Gomes
appeal only on sentencing issues.
 Silva. On this appeal, Silva's first claim is that the
district court erred by rebuking his counsel in front of the jury,
thereby depriving Silva of a fair trial. On the second day of the
trial, Silva's counsel several times made objections and, after the
district court ruled, continued to make arguments or comments. The
judge then told counsel simply to object and not offer additional
argument unless so requested. The court repeated the request
outside the jury's presence, but the next day Silva's counsel made
further comments after the district judge overruled a government
objection, prompting the court to ask the defense counsel to stop
arguing.
 Several days later the district court sustained an
objection to questioning by Silva's counsel. Counsel continued to
argue the matter after the ruling. In front of the jury, the court
said that this was unacceptable and that if it happened again
defense counsel would be subject to discipline. When defense
counsel objected to the remark being made in the presence of the
jury, the judge said that defense counsel had previously made
inappropriate arguments in front of the jury, had been repeatedly
warned, and was now being reprimanded in front of the jury.
 At the next break, defense counsel moved for a mistrial,
which was denied. In the jury instructions at the end of the
trial, the judge told the jury that his directions to witnesses and
lawyers, including any statements by the judge that counsel were
being argumentative, were not matters for the jury to consider. 
Silva's counsel objected that the instruction was not specific
enough, but the court declined to elaborate. This is the sequence
that now leads to Silva's claim of unfair prejudice. See Glasser
v. United States, 315 U.S. 60, 83 (1942); United States v. Polito,
856 F.2d 414, 418 (1st Cir. 1988).
 The government defends the district court's rebuke as
justified and says that in any event Silva was not prejudiced. One
might ask why a rebuke of counsel should ever be delivered in front
of the jury since even a justified rebuke to counsel could
prejudice the defendant and could instead be delivered at side bar. 
Cf. Polito, 856 F.2d at 417-18 (rebuke in front of jury
disfavored).
 Under the case law, whether the rebuke was merited is a
relevant but not a controlling consideration. See, e.g., Logue v.
Dore, 103 F.3d 1040, 1046 (1st Cir. 1997); United States v.
Quesada-Bonilla, 952 F.2d 597, 600-01 (1st Cir. 1991). In this
case, the rebuke does seem to us amply justified (although we add
one caution as to form of directions to counsel). Whether and when
argument is permitted on routine matters is very largely for the
trial judge to decide, see Polito, 856 F.2d at 418; this is
especially so because lawyers can use arguments to posture in front
of the jury and to insinuate to it that the court's rulings
unfairly favor the other side. Here, counsel does appear to have
ignored several warnings to stop arguing after rulings had been
made, cf. Pisani, 773 F.2d 397, 403-04 (2d Cir. 1985), and the
court was fully entitled to emphasize its displeasure.
 One caveat is in order. Most of the district court's
concerns were with unwarranted argument by Silva's counsel,
especially after the court had already ruled on a motion or
objection. But once or twice the trial court seemingly directed
counsel not to state even the ground of objection unless requested
by the court. For example, at one point the court said, "Just
simply say 'objection.' I don't want to hear any argument. If I
think I don't understand what it is, I'll ask you for something. 
I understood what it was." This is a direction that, if taken
literally, does raise one concern.
 Specifically, Fed. R. Evid. 103(a)(1) requires a party to
state the specific ground of objection if the ruling admits
evidence, and if the ground is not obvious from context, on pain of
losing anything but a plain error claim on appeal. Fed. R. Crim.
P. 51 requires parties to "make[] known" objections to the actions
of the court "and the grounds therefor." Accord Fed. R. Civ. P.
46. Normally a ground of objection to evidence can been stated
without prolonged argument (e.g., "hearsay," "asked and answered,"
"not relevant"). At the very least, a lawyer told only to object
without stating grounds needs an opportunity if the ruling goes
against him to put his grounds on the record within a reasonable
time. There is no indication here that such an opportunity was
denied.
 In all events, no claim of unfair prejudice to Silva is
tenable on this record, considering the rebuke in the context of
the overall trial. Polito, 856 F.2d at 418. Silva's effort to
mount an entrapment defense and the hung jury at the first trial
show that Silva's conviction was not preordained. But the judge's
rebuke, not itself especially severe, was directed solely to
counsel's courtroom conduct and carried no suggestion that the
defense case was weak or that the judge sided with the prosecutor. 
United States v. Edmond, 52 F.3d 1080, 1101 (D.C. Cir.), cert.
denied, 516 U.S. 998 (1995); United States v. DiTommaso, 817 F.2d
201, 221 (2d Cir. 1987).
 Indeed, the judge rebuked the prosecutor for procedural
missteps on several occasions. United States v. Warner, 955 F.2d
441, 449 (6th Cir.), cert. denied, 505 U.S. 1227, amended and
superseded by 971 F.2d 1189 (1992). Moreover, the court later told
the jury that its admonitions to counsel were irrelevant to the
jury's task. Polito, 856 F.2d at 419. Trial judges are justifiably
accorded broad latitude to ensure proper courtroom behavior. 
Liteky v. United States, 510 U.S. 540, 555-56 (1994); Deary v. City
of Gloucester, 9 F.3d 191, 195-96 (1st Cir. 1993). We are
satisfied that the rebuke was not inappropriate and, further, that
it did not contribute to the conviction.
 Next, Silva--joined by Serpa (appealing from his separate
conviction on identical grounds)--claims error in the district
court's exclusion of certain defense witness testimony and
restrictions as to cross-examination about alleged bad acts by
Madsen. In general, we review the district court's restrictions on
cross-examination or impeachment for abuse of discretion, but we
resolve de novo abstract legal issues (e.g., the meaning of a
Federal Rule of Evidence), and we examine the record de novo to
ensure that the defendant received his Sixth Amendment right to a
reasonable chance to explore the witnesses' veracity, bias, and
motivation. United States v. Laboy-Delgado, 84 F.3d 22, 28 (1st
Cir. 1996).
 The strongest claim made by Silva and Serpa relating to
evidentiary rulings concerns the troubling allegation that Madsen,
in violation of his cooperation agreement with the government,
privately purchased an ounce of cocaine for himself while working
for the government. At both Silva and Serpa's trials, a DEA agent
testified that a confidential informant had reported the
transaction to the DEA. Madsen denied that the transaction had
occurred. Both the agent and Madsen were vigorously cross-examined
on the matter before the jury.
 On appeal, Silva says that the court erred in refusing to
permit him to call the confidential informant as a witness to
confirm that the transaction had occurred as he had reported, and
Serpa joins in the claim. Extrinsic evidence of specific bad acts
is not admissible to show untruthfulness, Fed. R. Evid. 608(b),
even assuming that breaching the cooperation agreement suggests
that trait in Madsen, or to contradict the witness on a collateral
matter, United States v. Beauchamp, 986 F.2d 1, 3-4 (1st Cir.
1993), which this was so far as Silva or Serpa's own crimes were
concerned. However, extrinsic evidence is admissible to show bias. 
United States v. Abel, 469 U.S. 45, 51 (1984); Beauchamp, 986 F.2d
at 4. Silva and Serpa's theory is that Madsen's alleged purchase
gave the government grounds to tear up its cooperation agreement
and prosecute Madsen vigorously, thus giving Madsen a further
incentive to slant his testimony in favor of the government.
 The bias theory probably holds together, but the trial
judge had discretion to exclude such an excursion into extrinsic
evidence that would distract from the main issues and in this case
would add little of practical value to the defense. Beauchamp, 986
F.2d at 4; United States v. Devin, 918 F.2d 280, 293 (1st Cir.
1990). There was no indication that the government planned to
revoke the agreement and risk losing its star witness. Cf. United
States v. Atherton, 936 F.2d 728, 733-34 (2d Cir. 1991) (no
probability of government prosecution), cert. denied, 502 U.S. 1101
(1992). And the cooperation agreement already gave the jury an
ample and more solid reason to question Madsen's testimony as the
fruit of lenient treatment. 
 Two other such restrictions are challenged. The district
court refused to allow one witness to testify that Madsen had
boasted of torturing another drug dealer, and also precluded yet
another witness from testifying that Madsen had threatened him with
harm. The connection with bias is remote in both cases (there was
no realistic threat of prosecution); and the torture testimony was
doubtful and inflammatory. Both allegations were developed on
cross-examination of Madsen (who denied the torture and the threat)
and were thus known to the jury. See Anderson, 139 F.3d 291, 302
(1st Cir.), cert. denied, 1195 S. Ct. 158 (1998). Exclusion of
further evidence was within the district court's discretion to
limit excursions. See id.; Beauchamp, 986 F.2d at 4.
 The Confrontation Clause lies obscurely behind such
claims of evidentiary error because, in a few extreme cases, the
Supreme Court has invoked it to overturn state court restrictions
on cross-examination or impeachment. However, such a challenge is
tenable only where the restriction is manifestly unreasonable or
overbroad. Olden v. Kentucky, 488 U.S. 227, 231 (1988); Delaware,
475 U.S. at 679; see also Anderson, 139 F.3d at 302. Here,
defendants were allowed not only to develop reasonably their claims
of bias based on the cooperation agreement, but also to draw the
jury's attention to the very "bad acts" in question, being limited
only in the extent of proof or development.
 Silva lastly objects that the district court should have
declared a mistrial after a juror at the second trial, Alan
Smolinski, discovered in the jury room a copy of the indictment
used at the first trial. This indictment included, inter alia, a
first count charging Silva and others with conspiracy, an offense
of which he was acquitted at the first trial. Apparently, the
indictment had been left behind in the jury room after the first
trial. Smolinski told other jurors that he had discovered a court
paper "that shouldn't be here" but did not discuss its substance. 
 When Smolinski turned the document over to the court, he
was questioned and said he would be impartial. The court also voir
dired the other jurors, who denied knowing the contents of the
document (although three knew that it was an indictment), and all
said they could be impartial. At defense counsel's request the
court dismissed both Smolinski and a second juror whom Smolinski
had consulted as to what to do with the document, but the court
refused to declare a mistrial or dismiss other jurors. We review
the court's decision for abuse of discretion. United States v.
Walsh, 75 F.3d 1, 6-7 (1st Cir. 1996).
 There is nothing to show that any juror who remained on
the jury had any knowledge of the contents of the document beyond
knowledge that it was an indictment. At oral argument, counsel's
only explanation of harm is that the jury may have speculated that
the document was adverse to the defense. But this may be so any
time that the defense blocks a prosecutor's question or tender of
real evidence in open court. Trials are expected to be fair, but
not necessarily perfect; and appeals courts are slow to insist on
mistrials, even in cases where the question or comment may actually
convey prejudicial information.
 Instead, much is left to the discretion of the district
judge, who is present at the scene and can best gauge the impact on
the jury of the improper event or information. United States v.
Rivera-Gomez, 67 F.3d 993, 998 (1st Cir. 1995); Sepulveda, 15 F.3d
at 1184. This is especially true where, as here, the district
court makes careful use of voir dire, instructions or other
measures to identify the extent of any harm and to remedy it. 
DiSanto, 86 F.3d at 1248-49; Sepulveda, 15 F.3d at 1184; see also
Magana, 127 F.3d at 6. Certainly in an extreme case denial of a
mistrial may be reversible error, Sepulveda, 15 F.3d at 1184, but
not where the judge removed the only jurors colorably claimed to
have been contaminated.
 This case does not involve deliberate misconduct by
either side or exposure of a retained juror to substantively
damaging information. It is thus unlike Remmer v. United States,
347 U.S. 227, 229 (1954), where the Supreme Court spoke of a
(rebuttable) presumption of prejudice from improper exposure or
tampering--even assuming Remmer remains the law. Compare United
States v. Sylvester, 143 F.3d 923, 934 (5th Cir. 1998); United
States v. Williams-Davis, 90 F.3d 490, 494-99 (D.C. Cir. 1996),
cert. denied, 519 U.S. 1128 (1997). In all events, the facts
developed through the voir dire brought this case well within the
district court's discretion to allow the case to continue,
discretion that we think was well exercised in this case.
 Serpa. The most unusual question in this case is Serpa's
claim that he was denied effective assistance of counsel. To
prevail, Serpa must establish that his counsel's performance fell
below an objective standard of reasonableness, Strickland v.
Washington, 466 U.S. 668, 687-88 (1984), and that he was prejudiced
by counsel's errors, id. at 691-96. Counsel's judgment is subject
to highly deferential review, id. at 689, and there is prejudice
only if defendant establishes that he would probably have been
acquitted absent his counsel's mistakes, id. at 694.
 However, Serpa's claim of ineffective assistance is a
novel one: it rests on the undisputed fact that, in closing
argument, Serpa's counsel flatly admitted Serpa's guilt as to a
single transaction--the sale on June 28, 1997, of two ounces of
cocaine to an undercover officer. Counsel explicitly told the jury
that as to "the second deal, Julio Serpa did that." This sale
constituted one of four distribution counts against Serpa
comprising four specific sales by Serpa and Gomes in the period
June-August 1995. In the end, the jury convicted Serpa on all of
these counts as well as the conspiracy count.
 Counsel's concession was a calculated gamble. Admitting
guilt as to one transaction, Serpa's counsel sought to contrast it
with the three others where Serpa was present but arguably more
passive, allowing counsel to argue that as to them Serpa was only
an observer. By limiting Serpa's criminal involvement to one sale,
counsel sought also to separate him from the broader conspiracy. 
Counsel argued vigorously in favor of acquittal on the other
counts, using the contrast in Serpa's favor (e.g., "Those other
transactions . . . Julio Serpa was present . . . . But . . . there
ain't no participation. He did nothing.").
 This was patently a reasonable strategy. The
government's case as to the second transaction was overwhelming. 
It included not only testimony from Madsen but also from a police
officer posing as his partner. The transaction was audiotaped and
witnessed by yet other agents at a distance. And Serpa's conduct
on June 28 was unambiguous: he took the payment money from the
officer posing as Madsen's partner and handed back two ounces of
cocaine in exchange. Nor did Serpa have a plausible entrapment
claim. Conviction was almost inevitable.
 In some cases, a concession on one count might increase
the chances of conviction on others. But here it allowed defense
counsel to contrast Serpa's active role on one transaction with his
alleged mere presence on others and then, by narrowing Serpa's
purported involvement, to argue against conviction on the
conspiracy count. Further, by avoiding a hopeless claim of
innocence on one count, counsel preserved some credibility with the
jury for use where it might help. The result was an uphill
argument, and it failed, but the tactic was certainly not
incompetent representation. United States v. Tabares, 951 F.2d 405,
409 (1st Cir. 1991); cf. Jones v. Barnes, 463 U.S. 745, 751 (1983).
 Serpa's cursory analogy to a guilty plea without
safeguards (including the explicit consent and participation of the
defendant and a good many formalities as well, Fed. R. Crim. P. 11)
is a false one. Counsel's concession was not a guilty plea, which
involves conviction without proof, and is therefore properly hedged
with protections. Here, the government had to provide a jury with
admissible evidence of guilt and did so in abundance. Serpa's
claim that Rule 11 was short-circuited is virtually identical to a
claim squarely and properly rejected by the Seventh Circuit in
Underwood v. Clark, 939 F.2d 473, 474 (7th Cir. 1991) (Posner, J.).
 Of course, Serpa could argue that even the most competent
counsel ought to get the defendant's consent before following a
strategy bound to produce a conviction on at least one count. An
argument based on lack of consent could not be made on this record;
in fact, Serpa's brief implies that Serpa was told in advance and
acquiesced (the brief says that Serpa "felt compelled to follow
Counsel's advice even though this was against his wishes"). We
leave for another day the question of whether and when a
defendant's consent (or objection) to a course of action might be
relevant to an ineffective assistance claim. See Underwood, 939
F.2d at 474-76; cf. Bell v. Evatt, 72 F.3d 421, 430 (4th Cir.
1995), cert. denied, 518 U.S. 1009 (1996).
 Quadros. The district court determined that Quadros was
responsible for a kilogram of cocaine. After certain adjustments
to the offense level, this gave Quadros a guideline sentencing
range of 41 to 52 months' imprisonment. However, the statute
imposes a mandatory minimum of five years' imprisonment where the
drug trafficking offense involves a half kilogram or more of
cocaine. 21 U.S.C. 841(b)(1)(B)(ii). The district court
therefore sentenced Quadros to 60 months' imprisonment. See
U.S.S.G. 5G1.1(b) (references are to the 1995 edition).
 On appeal, Quadros contests the ruling that he was
responsible for a kilo of cocaine. Although findings of fact are
reviewable only for clear error, United States v. Muniz, 49 F.3d
36, 41 (1st Cir. 1995), Quadros's legal claims are reviewed de
novo, id., and he makes both kinds of arguments. As pertinent
background, we note that Quadros pled guilty both to conspiracy and
to two counts of distribution, one charging distribution on August
8, 1995, and the other on May 14, 1996. It is the May 14, 1996,
transaction that controlled Quadros's sentence because the August
8, 1995, sale was only 10 grams.
 The district court found that the May 14, 1996,
transaction involved an effort by Quadros to facilitate the
attempted sale of a kilo to Madsen by Jose Aguiar. The evidence
supports this finding. Between March and May 1996, Quadros--
admittedly a minor player--sought to bring Madsen into contact with
Aguiar so that Aguiar could supply Madsen with cocaine. Quadros
told Aguiar that Madsen wanted to discuss the purchase of kilos
and, before the May 14, 1996, meeting, Quadros advised Aguiar that
Madsen wanted to purchase a kilo; Aguiar arrived at the meeting,
accompanied by Quadros, expecting to make such a sale.
 At the meeting, Madsen (under instruction from the DEA)
surprised both Aguiar and Quadros by saying that he wanted an ounce
sample "before I buy a brick." Aguiar said that a kilo or half
kilo was a better bargain, but Madsen insisted on purchasing a
sample "first just to try it out"; he assured Aguiar that, "[i]f
the stuff is really good, I'll let you know soon." No later sale
was made, but the evidence permitted the district court to find
that Quadros had arranged with Aguiar to make the sale of a kilo or
had aided and abetted Aguiar's effort to make such a sale.
 Quadros' legal argument, which is the heart of his
appeal, is that the guidelines address the case of a delivery that
is smaller than the amount agreed upon and provide expressly that
the amount delivered should govern. The most pertinent sentences
in this portion of the guideline commentary read as follows: 
 In an offense involving an agreement to sell a
 controlled substance, the agreed-upon quantity
 of the controlled substance shall be used to
 determine the offense level unless the sale is
 completed and the amount delivered more
 accurately reflects the scale of the offense. 
 For example, a defendant agrees to sell 500
 grams of cocaine, the transaction is completed
 by the delivery of the controlled substance -
 actually 480 grams of cocaine, and no further
 delivery is scheduled. In this example, the
 amount delivered more accurately reflects the
 scale of the offense.

U.S.S.G. 2D1.1, cmt. n.12 (emphasis added).
 We think that Quadros' argument mistakes a plausible
example for a universal requirement, ignoring the full "unless"
clause in the prior sentence. In the example, the difference in
the amounts is small, the defendant was the one who decided to
deliver less than promised, and the defendant was not independently
conspiring with or aiding an accomplice in the sale. In such a
case, the amount delivered and not the amount initially agreed may
well "more accurately reflects the scale of the offense," U.S.S.G.
 2D1.1, cmt. n.12 (1995), but this language itself calls for a
fact-bound assessment by the sentencing judge.
 To take the 480-gram example in isolation--as a
mechanical rule for every agreement followed by a delivery--would
ignore the topic sentence that precedes the example, including its
presumption that the amount intended to be sold ordinarily governs
"unless" the judge concludes that the lesser amount delivered "more
accurately" reflects the scale of the offense. U.S.S.G. 2D1.1,
cmt. n.12. It would overturn much case law supporting the
presumption and produce the odd and unfair result whereby the
defendant who delivers less than the amount promised automatically
gets a lower sentence than the one who delivers nothing. Note 12,
read as a whole, intends a more subtle calculation--although its
language still needs refinement.
 Even if his role was limited, Quadros did conspire with
Aguiar, or assist Aguiar in attempting, to make a sale of a kilo. 
The district court found as a fact that the kilo sale failed only
because Madsen declined to accept the full amount. Cf. U.S.S.G. 
2D1.1, cmt. n.12 ("In contrast, in a reverse sting, the agreed-upon
quantity of the controlled substance would more accurately reflect
the scale of the offense because the amount actually delivered is
controlled by the government, not by the defendant."). We therefore
believe that the district court permissibly found that the kilo
intended to be sold and not the ounce actually delivered "more
accurately reflects the scale of the offense." Id.
 Gomes. Gomes, who also contests his sentence, pled
guilty to the conspiracy count and four counts of distribution, as
well as other crimes (primarily, money laundering) that did not
affect the term of imprisonment later imposed. That term, 168
months, was reached by the district judge after calculating Gomes'
guideline range and then departing downward on the ground that
Gomes' criminal history category (category VI) overstated his
culpability. The guideline range resulted from a finding that
Gomes was responsible for between 15 and 50 kilos of cocaine.
 On appeal, Gomes says that he is responsible only for the
278.8 grams involved in a single sale, a figure that even under
category VI would give him a maximum guideline sentence well below
168 months. The government supports the 15 to 50 kilos figure but
says that we can affirm without reaching this factual issue. See
United States v. Tavano, 12 F.3d 301, 307 (1st Cir. 1993). It
points out that because Gomes had two prior convictions for felony
drug offenses, the guidelines prescribed a minimum offense level
above the level for 15 to 50 kilos and a guideline range with a
minimum well above 168 months. U.S.S.G. 4B1.1.
 The district court shared the government's view that the
career offender guideline controlled as the starting point for a
departure; but the court computed the 15 to 50 kilo figure on a
precautionary basis because Gomes might succeed in state court in
setting aside some of the predicate convictions that underlie his
career offender status. Under a clearly erroneous test, Muniz, 49
F.3d at 41, we conclude after a review of the record that the
government's proffered evidence of amount did support the 15 to 50
kilos found as a fact by the district court. The details need not
be recounted, but it is worth noting that the pre-sentence report
deemed Gomes responsible for at least 93 kilos.
 Affirmed.