UNITED STATES of America, Appellee,

v.

John D. POLITO, Defendant, Appellant.

No. 88–1048.

United States Court of Appeals,
First Circuit.

Argued July 28, 1988.
Decided Sept. 12, 1988.

---

John G. Vanacore, Concord, N.H., with whom Leahy, Vanacore, Nielsen & Trombly and David Trumble, Milton, N.H., were on brief, for defendant, appellant.

Peter E. Papps, Asst. U.S. Atty., with whom Richard V. Wiebusch, U.S. Atty., Concord, N.H., was on brief, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

On a midsummer day in 1987, a federal grand jury indicted defendant-appellant John D. Polito for distribution of cocaine.[1] He was tried in the United States District Court for the District of New Hampshire, adjudged guilty by a jury, and sentenced. Polito then appealed. Though the yarn spun at trial was an absorbing one which evoked images from an earlier, perhaps more romantic time,[2] we resist the temptation to tell the tale in full. Instead, we discuss the facts in connection with the assignments of error—and then, only to the extent necessary to place each point into its proper perspective.

## I. ENTRAPMENT

A. *The Entry–Level Burden.* Appellant's principal assertion is that the jury should have been—but was not—instructed on the defense of entrapment. It is, of course, settled that such a defense comprises two interrelated elements: (1) government inducement of an accused's criminal conduct, coupled with (2) the lack of predis-

---

1. The statute in question provides in pertinent part:
   ... [I]t shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; ....
   21 U.S.C. § 841(a)(1).

2. It was almost four centuries ago that the Bard of Avon wrote:
   For aught that I could ever read,
   Could ever hear by tale or history,
   The course of true love never did run smooth.
   W. Shakespeare, *A Midsummer–Night's Dream* (1596). The accuracy of the forecast seems to have been vindicated in full measure when defendant's longtime inamorata, Nicky French, absconded with a mysterious Turk, John Ozkok, thus triggering defendant's wide-ranging odyssey in search of his once and former paramour. It was this frenetic chase, and the hope of returning Ms. French to his side, which brought Polito to the doorstep of the federal Drug Enforcement Administration (DEA).

position on the person's part to engage in such skulduggery. *Mathews v. United States*, ── U.S. ──, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Murphy*, 852 F.2d 1, 4–5 (1st Cir.1988); *United States v. Coady*, 809 F.2d 119, 122 (1st Cir.1987). Although "[t]he question of entrapment is generally one for the jury," *Mathews*, 108 S.Ct. at 886, that is not universally so. *See, e.g., Coady*, 809 F.2d at 121–22; *United States v. Fera*, 616 F.2d 590, 596 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980); *see also Mathews*, 108 S.Ct. at 888 (remanding for consideration of whether "the evidence at trial was insufficient to support an instruction on ... entrapment"). Although the burden of proof does not shift—the prosecution must prove guilt beyond a reasonable doubt (including lack of entrapment, if the defense is properly in the case)—a defendant who wishes entrapment to be considered must shoulder what we have described as an "entry-level burden." *Coady*, 809 F.2d at 122. This burden requires that he proffer "a threshold showing that a government agent turned him from a righteous path to an iniquitous one." *Id.; see also Murphy*, 852 F.2d at 5 (quoting *Coady*); *United States v. Bradley*, 820 F.2d 3, 7 (1st Cir.1987) (same).

The initial showing necessitates some evidence on each of the two prongs of the defense: inducement and unreadiness. There is, at present, no bright-line rule in this circuit as to the quantum of proof which will enable the proponent to cross the threshold and warrant a charge to the jury on entrapment. *See generally Murphy*, 852 F.2d at 4–5 (discussing existing uncertainties). But though the overall dimensions of a defendant's entry-level burden may be less than incandescently clear, our cases leave no doubt that, at the very least, the proffered evidence must "amount to more than a mere scintilla." *Fera*, 616 F.2d at 596.

We have read the entire record in this case with considerable care. We find that Polito offered virtually no proof on either furculum. Even when we take the facts most generously in appellant's favor, the totality of what confronts us adds up to zero—or so near zero as to constitute less than the merest imaginable scintilla. Thus, we can comfortably leave for some other day any attempt to limn more exactly the size and shape of the theoretical entry-level burden.

B. *Discussion.* As to inducement, the defendant's asseveration amounts to the quixotic triumph of hope over reason. When the object of his affections jumped ship, *see supra* note 2, Polito contacted the DEA, thinking rather wishfully that the agency would use its resources to bring Nicky to earth. He spoke mainly with Agent Keaney. He asked for information concerning Nicky's whereabouts, but received none. Desperate for a lead, Polito—in his own words—"decided that I was going to get information for [Keaney] and that [Keaney] would help me." 2 Trial Transcript (T.) at 116. Defendant proceeded to drum up, and participate in, three separate cocaine transactions (including the one for which he was indicted). The record shows beyond any question that, far from enticing the accused into the drug trade, Keaney never suggested such a perilous course. Indeed, it is uncontroverted that, until after the third transaction was consummated, Keaney never knew with any certainty that Polito was engaged in trafficking.

Taking the evidence of record in the light most flattering to appellant, and drawing all reasonable inferences therefrom to his advantage, the testimony has not the slightest tendency to show that the DEA led Polito from the righteous path to the iniquitous one. Defendant conceded that Keaney specifically told him "not to sell drugs." 2 T. at 157. Putting the best face on things, defendant's version of events showed only an unfounded, unilateral belief that, by dealing drugs and discovering data, he could curry official favor and put Keaney in his debt. As Polito stated at trial:

> I planned to ... get a buy.... and then set them up ... so that [Keaney] could help me ...—in my own mind—that he could do something to help me.

*Id.* at 119. *See also id.* at 116 (quoted *supra*); *id.* at 131 ("My only motivation was to find out information—to find out a drug dealer so I could get to Al Keaney and get information about Nicky.").

It is true that effective inducement can sometimes be subtle rather than blunt, indirect rather than direct. Yet there must be some plausible connection between government conduct and a defendant's ensuing participation in felonious activity. The accused's subjective belief that the authorities will welcome his criminality, without more, falls well short of showing government instigation of the kind necessary to animate an entrapment defense. *Cf., e.g., Coady,* 809 F.2d at 122 ("mere solicitation" by government actors, without more, does not comprise entrapment); *United States v. Kakley,* 741 F.2d 1, 4 (1st Cir.) ("[c]onclusory and self-serving statements" insufficient to meet defendant's initial burden of production), *cert. denied,* 469 U.S. 887, 105 S.Ct. 261, 83 L.Ed.2d 197 (1984); *Fera,* 616 F.2d at 596 (government's "affording the defendant the opportunity for commission of the offense," standing alone, not enough to make out entrapment).

Because appellant offered not even a scintilla of evidence competent to show inducement, he plainly failed to satisfy his entry-level burden. Absent any cognizable proof of one of the two essential elements of an entrapment defense, the district court was on solid ground in declining to submit the issue for jury consideration.[3]

## II. THE GRAPES OF WRATH

A. *What Transpired.* Defendant's next point stems from an incident which occurred during his direct examination. In a nonresponsive aside, Polito boldly referred to some aborted plea negotiations. The reference was plainly an improper one. *See* Fed.R.Evid. 410(4) (outlining inadmissibility of evidence anent unsuccessful plea discussions). The prosecutor objected. The judge struck the unsavory testimony, instructed the jury to disregard it, summoned counsel to sidebar, and directed the following remarks to the defense lawyer:

> So you will know, Mr. [Lawyer], I intend, regardless of the outcome, to report that last bit of testimony to the New Hampshire Bar Association as a violation of the rules of professional conduct. I want you to know. You knew damn well about [the offensive testimony]. That's improper. You can take it up with the bar, but you make damn sure [Polito] doesn't do that again.

2 T. at 129–30.

The court then recessed so that the defendant and his attorney could confer. When the trial resumed—and before the jury was returned to the courtroom—defendant sought a mistrial, claiming that he could not "get a fair trial, the judge being so angry." *Id.* at 130. The motion was denied.

The following day, the matter was resurrected. Defense counsel raised the possibility that, although the colloquy occurred at sidebar, the jury might have overheard it. A voir dire was requested. The court declined the request but indicated that it would instead address the jury. The lawyer remonstrated no further, but merely responded, "Thank you." The court then proceeded to give a strong prophylactic instruction.

> It has been brought to my attention that perhaps some of you may have overheard a conversation between myself and defendant's counsel at the side bar yesterday. You have to disregard this. He satisfactorily explained to me it was his client not himself that engaged in an outburst, which is not to be held against

---

3. This gap in the proof renders virtually academic the state of the record on the second essential element of the defense (lack of predisposition). Nevertheless, we note in passing that we have been equally unable to discern any meaningful evidence of unreadiness to traffick in narcotics. At trial, Polito admitted that he had functioned as an active dealer in the Boston area some seven years before. He initiated the illicit 1987 transactions on his own, not in response to any government suggestion. He knew the players and the game, without requiring a government-furnished scorecard. He did not eschew the monetary profit which was a concomitant of his acts. Like the defendant in *Coady,* appellant was, "on any reasoned view of the record, no reluctant dragon...." 809 F.2d at 122.

the defendant or his attorney in any regard. Anything I have stated or done at side bar is not to concern you.

3 T. at 4. Counsel neither objected to this instruction nor renewed the earlier mistrial motion.

There followed the attorneys' summations and the court's charge. During the charge, the judge again adverted to the incident at sidebar:

Nothing that I may have said or done in the course of trial nor that I say in the course of these instructions is to be taken as an indication that I hold any opinion about the facts of the case or how the case should be decided. It is not my function to determine the facts but rather yours alone as jurors.

In like fashion, there have been objections and rulings and side bar conferences throughout the course of trial with respect to the offers of evidence. If you overheard any such conversations at side bar, disregard them. In sum, I have found neither or none of the parties to have acted improperly or unprofessionally in the conduct of this trial.

And you are not to attempt to speculate on the basis of any conferences or rulings as to how I think this case should be decided, for it is the sworn duty of the lawyers to interpose objections on behalf of their respective clients and my sworn duty as judge to rule on such objections, applying the law as I see it.

3 T. at 29–30. At the end of the charge, defense counsel objected to the quoted instruction as "prejudicial" and renewed the mistrial motion. He received no satisfaction.

B. *Discussion.* Although defendant has voiced a string of complaints about the rebuke and the events which followed, we can treat the matter as a unitary whole. It is conceded that defendant's outburst was unresponsive to the pending question and unfit for jury consumption. The situation demanded that the judge intervene. We assess the mode and manner of his intervention according to "a standard of fairness and impartiality," *Nordmann v. National Hotel Co.,* 425 F.2d 1103, 1109 (5th Cir.1970); *see also United States v. Pisani,* 773 F.2d 397, 402 (2d Cir.1985); *United States v. Harris,* 720 F.2d 1259, 1262 (11th Cir.1983), recognizing that each case tends to be fact-specific.

A judge is not a mere umpire: he is "the governor of the trial for the purpose of assuring its proper conduct." *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 698, 77 L.Ed. 1321 (1933); *see also United States v. McDonald,* 576 F.2d 1350, 1358 (9th Cir.) (similar; citing *Quercia*), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978). The task is taxing—a difficult and weighty one. In the oversight of its due performance, appellate courts must grant the presider some margin of humanity. Though we expect a trial judge to be sensitive to the judicial role and to exercise restraint in the face of admitted provocation, we have no right to anticipate that he will function as some bloodless automaton. Charges of partiality should be judged not on an isolated comment or two, but on the record as a whole. *See United States v. Twomey,* 806 F.2d 1136, 1140 (1st Cir.1986); *see also United States v. Welch,* 745 F.2d 614, 621 (10th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1364, 84 L.Ed.2d 384 (1985); *United States v. Billups,* 692 F.2d 320, 327 (4th Cir.1982), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983). In the last analysis, litigants are entitled to a fair trial, but not necessarily a perfect or a monochromatic one.

■ In the instant case, the fact that the judge displayed some ire at sidebar, though not to be encouraged, did not deprive defendant of a fair trial. Given the circumstances—especially the egregious nature of the witness's effusion—some admonishment was plainly in order. Although not picture perfect, the nature and manner of the judge's response—viewed in the context of the trial as a whole—did not jeopardize Polito's chances or compromise his substantial rights. The initial mistrial motion was appropriately denied.

■ Appellant fares no better when we consider the court's refusal to conduct a voir dire inquiry. On this record, whether

or not the jury overheard what was said at sidebar is of no consequence. If we assume that the jurors heard every syllable of every word, the sockdolager is simply this: the strong, firm, and twice-repeated prophylactic instructions were adequate to dispel any possible damage.[4]

In sum, we find that the fairness of the trial was not compromised by the rulings which trailed in the wake of Polito's volunteered injection of the failed plea bargain into the trial. The rebuke to counsel at sidebar, even if overheard, was completely palliated by ensuing events. The only aspersion on the defendant—the court's explanatory statement to the jury that it "was [the] client not [the defense lawyer] that engaged in an outburst," *see supra* at 417 drew no contemporaneous objection. Waiver aside, the court's instructions eradicated any conceivable untoward effect.

## III. THE HEARSAY

A. *What Transpired.* The final reason of appeal need not engage our attention for long. Appellant bemoans the admission of a certain bit of testimony. During the government's case in chief, while agent Keaney was on redirect, he was asked why DEA had begun to focus on Polito. The witness replied:

> I started an investigation based on information provided to me by [an informer] and also after my conversations and investigations with the Laconia Police Department and Agent Haskell of the FBI.

2 T. at 39. Keaney was then asked: "What did you learn from those conversations?" *Id.* A timely objection was overruled, and the witness replied:

> I was advised by Detective Michael Neilson of the Laconia Police Department that Mr. Polito was of record with them as being suspected of trafficking cocaine

as early as 1985 at a place called the Nashville North Night Club in the Weirs Beach section of Laconia, which was managed by Mr. Polito.

*Id.* No motion to strike was made with regard to either answer.

Later that day, after the prosecution had rested and outside the jury's presence, defendant moved to strike the last-quoted answer. The court responded: "It's been stricken." *Id.* at 47. The judge went on to observe that "when something is stricken, the jury disregards it and they will be instructed again at the close of the case to disregard it." *Id.* at 48.[5] But life was not so simple. Though all parties apparently believed that the answer had been stricken —for aught that appears, both defense counsel and the prosecutor agreeably acquiesced in the judge's stated recollection— the transcript fails to substantiate that shared belief. Insofar as we can ascertain, the jury was never told to disregard the answer.

B. *Discussion.* The testimony— though undoubtedly offered in good faith— was the rankest of hearsay. It should not have been admitted. Once introduced, it should (as the trial judge intimated) have been deleted and the jury told specifically to ignore it. Yet troubling though its presence is, we think that, viewed in the context of the entire record, the bevue was benign. The evidence against defendant was very strong; the answer was one isolated piece of readily recognizable gossip in the context of a three day trial; properly-admitted evidence of Polito's prior drug trafficking exploits circa 1980 was before the jury, *e.g.*, 2 T. at 133–35; *id.* at 162, and appellant had acknowledged that activity; and counsel on both sides, in summing up, treated the offending answer as if it had

---

4. The argument that the curative instructions themselves were prejudicial is a curious one. As noted, defendant did not object to the giving of the first curative instruction, or to its form. Certainly, that instruction, on its face, did not sink to the level of plain error. It cannot, therefore, support an assignment of error on appeal. *See United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.1987). The instruction con-

tained in the court's charge, quoted *supra* at 417–18, was a model of fairness.

5. This promise was kept. During the charge, the jury was told that, where evidence had been stricken, it must be disregarded. *See* 3 T. at 30. A kindred instruction had been given at the very start of the trial. *See* 1 T. at 6.

been stricken.[6] Although it was brought out at oral argument that the hearsay could conceivably have undermined defendant's claim of lack of predisposition, that was an irrelevancy because, in any event, there was no proof of inducement sufficient to reach the jury. *See supra* Part I(B).

Under these idiosyncratic circumstances, we do not believe that there was any realistic possibility that admission of the evidence influenced the outcome of the trial. Despite the fact that an error occurred, it did not affect the defendant's substantial rights, and was, therefore, harmless. *See* Fed.R.Crim.P. 52(a).

## IV. CONCLUSION

We need go no further. Without exception, Polito's assignments of error are unavailing. Based on what we have seen in the course of this appeal, defendant was fairly tried and justly convicted.

AFFIRMED.

---

**6.** Defense counsel argued to the jury that the "uncontroverted testimony" showed appellant to have enjoyed "clean living" for some seven years. The prosecutor did not allude to, or even hint at, the "stricken" evidence in the course of his rebuttal.