USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1111

 UNITED STATES OF AMERICA,

 Appellant,

 v.

 ROBERT BROOKS,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Edward F. Harrington, U.S. District Judge]

 ____________________

 Before

 Selya, Circuit Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 

 David J. Apfel, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief, for
appellant.
 James B. Krasnoo, with whom Richard Briansky was on brief, for
appellee.

June 5, 1998

 
 SELYA, Circuit Judge. This interlocutory appeal, brought
pursuant to 18 U.S.C. 3731, challenges a brink-of-trial order
precluding the government from introducing into evidence certain
proof that it deems essential to the prosecution of the crimes
charged. A subsequent clash of wills between the prosecutor and
the district judge complicates the picture on appeal. We rehearse
the background and the travel of the case, untangle a
jurisdictional snarl, and then address the merits of the dispute. 
In the end, we vacate the preclusory order and remand for further
proceedings before a different district judge.
I. BACKGROUND
 In the underlying criminal case, the government charged
defendant-appellee Robert Brooks with lying to a federal grand
jury. To lend context to the issues before us, we recount the
circumstances leading up to the defendant's indictment on perjury
and obstruction of justice charges.
 A. Dramatis Personae.
 Starting in 1983, Brooks worked as a baggage handler for
Northwest Airlines at Logan International Airport. While there, he
became friendly with a co-worker, Joseph Nuzzo. Some four years
later, Northwest broke the gender barrier and hired Susan
Taraskiewicz as a baggage handler. With a few notable exceptions,
Brooks and Taraskiewicz had little interaction. Early on, however,
the pair twice indulged a sexual dalliance, and, on one subsequent
occasion, they argued bitterly over Brooks's destruction of
Taraskiewicz's radio.
 In April of 1989, Taraskiewicz attempted to break up a
fistfight between Nuzzo and two other employees. Displeased by her
gratuitous intervention, Nuzzo called Taraskiewicz a "f_ _ _ _ _ g
c_ _t." This incident capped a string of disciplinary infractions
and led Northwest to fire Nuzzo. Nuzzo's discharge was not
permanent it turned out to be the functional equivalent of a six
month suspension without pay but Nuzzo vociferously blamed
Taraskiewicz for his predicament. During his absence from work, he
engaged in a campaign of menacing conduct directed at Taraskiewicz: 
he "keyed" her car, slashed her tires, staked out her house, made
anonymous telephone calls, and told others that he would exact
revenge. Brooks knew that Nuzzo blamed Taraskiewicz for his
enforced vacation and that Nuzzo harbored considerable ill will
toward her.
 B. Theft and Murder.
 Shortly after Nuzzo returned to work, he and several
other baggage handlers began to steal credit cards from mail bags
air-freighted by Northwest. The thieves purloined thousands of
charge cards, using some of them to make unauthorized purchases and
selling others to fences. Brooks was a peripheral player; he did
not himself steal any charge cards but he occasionally shopped with
Nuzzo, using stolen cards, and he sometimes functioned as a paid
lookout for Nuzzo and the other thieves.
 In 1991, an inter-agency task force launched an
investigation into the credit card scheme. The investigation
remained in the bosom of the lodge until August 4, 1992, when
several baggage handlers received subpoenas from a Boston-based
federal grand jury (the Credit Card Grand Jury). Members of the
ring, including Nuzzo, wondered whether there was a stool pigeon
among the baggage handlers. In Brooks's presence, Nuzzo posited
that Taraskiewicz was the "rat."
 On August 14, a Northwest official confiscated Nuzzo's
work identification, effectively ending his employment. In rapid
sequence, Nuzzo learned that he was a target of the grand jury
investigation, hired a lawyer, and griped to friends (following a
meeting between his attorney and a prosecutor) about both the
severity of the criminal sanctions that he faced and the
extravagance of his lawyer's fee demands. In the early morning
hours of September 13, 1992 less than a week after Nuzzo voiced
these complaints Taraskiewicz left work to get a sandwich and
failed to return. The next day, the authorities discovered her
body in the trunk of her automobile.

 C. To Tell the Truth.
 Brooks applied for reassignment immediately after news of
the grand jury investigation leaked. He received the requested
transfer and moved to Minnesota with his new bride on August 25,
1992. Following Taraskiewicz's murder, however, the government
subpoenaed him to appear before the Credit Card Grand Jury. Brooks
returned to Massachusetts in response to this subpoena but asserted
his Fifth Amendment privilege. That same afternoon, a state
trooper interrogated him regarding the murder. In the course of a
one-hour interview, Brooks downplayed his relationship with Nuzzo
and claimed that he had had only one telephone conversation with
his friend during the week after the murder. In accounting for his
own whereabouts on the night of September 13, Brooks said that he
had worked the late shift at the Minneapolis-St. Paul airport,
handling luggage until 11:00 p.m.
 During the 1994-1995 time frame, Brooks cooperated in the
credit card investigation. His testimony apparently helped to
convict Nuzzo of various charges connected to the credit card
scheme. Eventually, Brooks pled guilty to conspiracy to commit
mail theft and credit card fraud. The government requested that
the court recognize Brooks's substantial assistance and depart
downward in imposing sentence. See USSG 5K1.1. Brooks escaped
with a term of probation.
 In the fall of 1996, storm clouds gathered anew. The
United States Attorney convened a second Boston-based grand jury
(the Murder Grand Jury) to look into Taraskiewicz's death. The
Murder Grand Jury subpoenaed Brooks in October and he again
returned to Boston. During a two-day meeting with law enforcement
agents, Brooks learned that Nuzzo was a target of the probe and
that the Murder Grand Jury was seeking to determine whether someone
assassinated Taraskiewicz to ensure her silence anent the credit
card case.
 Pursuant to a limited immunity agreement, Brooks
testified twice before the Murder Grand Jury. He admitted, interalia, that Nuzzo blamed Taraskiewicz for his six-month suspension
and that Nuzzo more than once expressed his staunch belief that
Taraskiewicz was a "snitch" who "blew the whistle" on the credit
card scheme. Brooks reiterated that he was working on the night of
Taraskiewicz's slaying and that he had not spoken to Nuzzo at all
that weekend. Although given the chance to recant or change his
testimony while still under oath, Brooks demurred.
 D. The Charges.
 In June 1997, the government confronted Brooks with
documentary evidence showing that he was not at work on the night
of the murder, that he talked to Nuzzo that weekend, and that the
two spoke frequently during the ensuing month. Facing time cards
and long-distance telephone records that contradicted both his
testimony to the Murder Grand Jury and his 1992 statements, Brooks
admitted that he had lied about his whereabouts and contacts with
Nuzzo. He expostulated, however, that his testimony was neither
intentionally false nor designed to impede the homicide
investigation. Unimpressed by this disclaimer, the Murder Grand
Jury charged Brooks with three counts of perjury, see 18 U.S.C. 
1623, and two counts of obstruction of justice, see 18 U.S.C. 
1503.
II. PROCEEDINGS BELOW
 Following some pretrial skirmishing, not material here,
the district court scheduled Brooks's trial to commence on February
9, 1998. One week prior to this trial date, Brooks filed five
motions in limine whereby he sought to prohibit the government from
introducing sundry types of proof, including evidence as to the
details of the murder, evidence of Brooks's conviction in the
credit card case, and evidence concerning the sexual encounters
between Brooks and Taraskiewicz. The government opposed these
motions. Its memorandum in opposition revealed that it
 intend[ed] to introduce evidence showing,
 inter alia, that: (a) Nuzzo was discharged
 from Northwest for six months in 1989-90 for,
 among other things, calling Taraskiewicz a
 "f__kin_ c__t; (b) Nuzzo blamed Taraskiewicz
 for his discharge; (c) following his
 discharge, Nuzzo swore to get even with
 Taraskiewicz, and promised to make her life
 miserable; (d) Nuzzo sliced Taraskiewicz's car
 tires, and "keyed" her car; (e) he made prank
 phone calls to her house; (f) he drove by her
 house with a friend, and noted that her street
 was dark, that she was going to pay, and that
 he was going to get even with her; and (g) in
 August 1992, just one month before
 Taraskiewicz's murder, and just after Nuzzo,
 Brooks, and other credit card thieves had
 learned that [federal agents] were on to them,
 Nuzzo stated that he bet Taraskiewicz was the
 "snitch" or the "rat."

Government's Opposition at 5 n.3. On February 6, Judge Harrington
issued an order granting Brooks's quintet of motions in substantial
part, including the motion to exclude proof anent his relationship
with the deceased. The court specified that it was barring
evidence of this relationship only from the government's case in
chief and left open the possibility that such evidence might become
relevant should Brooks opt to testify in his own defense.
 At approximately 9:00 a.m. on the morning of the first
trial day, immediately prior to jury empanelment, the defense filed
a sixth motion in limine. This motion sought the exclusion of all
evidence regarding Nuzzo's animosity toward Taraskiewicz. Judge
Harrington had not yet taken the bench but within fifteen minutes
the clerk announced that the judge had granted the motion. The
ruling took the form of an inexplicit margin order, and the
prosecutor asked the clerk to advise the judge that he wished to be
heard. The judge refused the request.
 At 9:30 a.m., the venire filed into the courtroom and
Judge Harrington assumed the bench. The prosecutor, David Apfel,
asked to approach the sidebar. The judge responded: "After the
jury is selected." The prosecutor persisted and the judge summoned
counsel to the bench. Without giving either lawyer an opportunity
to speak, Judge Harrington stated:
 Mr. Apfel, if you open your mouth once more,
 you'll be excluded from this case. With
 respect to the matter that I've heard you
 discuss previously with the clerk.[sic] I'm
 picking the jury now. You're either going to
 go back there or I'm excluding you from this
 case.

A colloquy then ensued:
 PROSECUTOR APFEL: I think you should exclude
 me, then, Your Honor, because I hereby notice
 of [sic] an appeal from your ruling allowing
 Motion in Limine No. 6.

 THE COURT: Motion denied.

 PROSECUTOR APFEL: It's not a motion, your
 Honor. You no longer have jurisdiction over
 the matter once we notice an appeal to your
 ruling. An appropriate certification is being
 prepared right now under [18 U.S.C. ] 3731. 
 The government simply can't go forward with
 this ruling. There is no evidence that we
 will be able to present as to a crucial
 element of each of the perjury counts and as
 to a crucial element of each of the
 obstruction counts.

 THE COURT: I'm picking a jury now, do you
 understand me?

 PROSECUTOR APFEL: I do. Your Honor, you no
 longer have jurisdiction, and I think that you
 should exclude me from the court.

 The bench conference concluded on this somber note and
the judge began jury empanelment. Within a very short span (ten
transcript pages), Timothy Feeley, Apfel's supervisor, entered the
courtroom. The following discourse took place:
 PROSECUTOR FEELEY: Your Honor, if I may,
 Timothy Feeley for the United States. The
 government requests permission to approach the
 side bar if we may, your Honor.

 THE COURT: Not at this time.

 PROSECUTOR FEELEY: Your Honor, in the
 alternative, the government would wish to file
 with the Court at this time a notice of
 appeal.

 THE COURT: Give it to the clerk, please.

 * * *

 PROSECUTOR FEELEY: Your Honor, given the
 filing of that document, may we now approach
 side bar?

 THE COURT: Denied.

 PROSECUTOR FEELEY: Your Honor, the government
 states for the record that this Court lacks
 jurisdiction.

 COURT: Here is the Please come.

 [At the bench]

 THE COURT: If you speak before that jury
 again, I'm going to declare a mistrial.

 PROSECUTOR FEELEY: Your Honor, may I be
 heard? The filing of a notice of appeal
 divests this Court of jurisdiction. This
 matter is now before the United States Court
 of Appeals for the First Circuit, and further
 proceedings by this District Court are without
 power.

 THE COURT: Let me tell you this, you have no
 right to appeal an interlocutory ruling, I
 would say, bordering on the obstruction of
 justice. [sic]. Now if you don't sit down,
 I'll call the marshals and have you arrested.

 PROSECUTOR FEELEY: Your Honor, I refer this
 Court to United States Code, Title 18, Section
 3731, that gives us the right to appeal a
 motion of this sort given the certification
 that we provided to the Court from the United
 States Attorney for this district.

 * * *

 THE COURT: What I'm going to do, I'm
 proceeding with or without you at this time. 
 If there is a stay issued by the Court of
 Appeals, I will obey their order. 

 PROSECUTOR APFEL: Your Honor 

 THE COURT: Let us proceed.

 PROSECUTOR APFEL: May [we] be heard briefly
 on this?

 PROSECUTOR FEELEY: I would like to be heard,
 Your Honor. The government will not
 participate further in these proceedings. We
 will spend our time for the next whatever time
 is necessary to obtain a stay.

 THE COURT: Then do so.

 PROSECUTOR FEELEY: Which, for the record, we
 do not feel is necessary, given the filing of
 a notice of appeal, that divests the Court of
 jurisdiction with or without a stay. If
 necessary, we will seek a stay.

 THE COURT: I am ordering you to seek a stay.

 PROSECUTOR FEELEY: Then we initially ask this
 Court to stay its proceedings to give us time
 to do that.

 THE COURT: Denied.

 PROSECUTOR FEELEY: Your Honor, we further ask
 this Court for a continuance of this matter 

 THE COURT: Motion denied.

Subsequent to this exchange, both prosecutors left the courtroom. 
Judge Harrington nonetheless persevered and continued empaneling a
jury in their absence.
 Approximately fifteen minutes later, with empanelment
still in progress, Apfel reentered the courtroom and again
requested a brief recess to facilitate the filing of a stay motion
in the court of appeals. Judge Harrington turned a deaf ear and
ordered twelve potential jurors to take seats in the jury box. 
Apfel remained in the courtroom and the parties proceeded to
exercise their peremptory strikes. During a bench conference
related to challenges, the protagonists received word that the stay
motion had been filed and that the court of appeals had taken it
under advisement. Apfel again solicited a short recess, and the
court again rejected his entreaty.
 When the parties' strikes were exhausted and fourteen
prospective jurors (including two alternates) were seated, Judge
Harrington directed the clerk to swear the jury. The following
exchange then took place at the bench:
 PROSECUTOR APFEL: Your Honor, may I be heard,
 before the jury is sworn in?

 THE COURT: Swear in the jury. I'm not going
 to put up with it any longer.

 PROSECUTOR APFEL: Your Honor, you haven't
 given us an opportunity, we're moving once
 again to stay these proceedings.

 THE COURT: Motion denied, motion denied,
 motion denied.

 PROSECUTOR APFEL: If you give us an
 opportunity to 

 THE COURT: Motion denied.

 The clerk thereupon swore the jurors and Judge Harrington
gave them a decurtate explanation of their functions. He then
ordered the government to make its opening statement. At that
juncture, the following transpired:
 PROSECUTOR APFEL: Your Honor, may we approach
 side bar?

 THE COURT: No. Please make the opening
 statement. 

 PROSECUTOR APFEL: In light of the Court's
 rulings this morning, Your Honor 

 THE COURT: Then I'll see you. I don't want
 you to make a statement before the jury.

 [At the bench]

 PROSECUTOR APFEL: In light of the Court's
 ruling this morning, the government's case is
 almost entirely eviscerated. Your Honor has,
 by virtue of his rulings, made it impossible,
 I would say, for the government to prove the
 crucial element of materiality with respect to
 the perjury counts and the crucial element of
 intent with respect to the obstruction counts. 
 You have by virtue of your ruling eliminated,
 I would say, 90 percent of what I intended to
 say in my opening. A motion is now pending
 with the First Circuit Court of Appeals which
 we expect to rule momentarily. It's my view
 that if the Court insists on going forward
 right now, if the government is forced to make
 an opening statement, in light of the Court's
 rulings, that the government would be
 irretrievably prejudiced in its opening
 statement in the case.

 THE COURT: Are you going to make your opening
 statement?

 PROSECUTOR APFEL: I am asking the Court for a
 recess for ten minutes.

 THE COURT: Motion denied.

 PROSECUTOR APFEL: The government is then,
 Your Honor, going to leave this room right now
 because the Court does not have jurisdiction
 over this matter, and we need a few moments. 
 I'm asking for a brief stay so that we can see
 what the Court of Appeals is doing.

 THE COURT: I'm asking you at this time I'm
 not letting you interfere with the regularity
 of the proceedings in the United States
 District Court. If the Court of Appeals takes
 any action, they shall do so and you will be
 alerted. At this time I am asking you, are
 you prepared to go forward? And I'm telling
 you this, if you do not, I will entertain a
 Motion to Dismiss. Are you prepared to go
 forward at this time?

 * * *

 Are you prepared to follow the [Court's]
 order?

 We need not repeat verbatim the remaining dialogue. It
suffices to say that the judge pressed relentlessly for an answer
to this question and threatened to dismiss the case with prejudice
if the prosecutor declined to open. After one last fruitless
attempt to persuade the judge to hold proceedings in abeyance
pending word from the court of appeals, the prosecutor yielded and
began his opening remarks. As he was speaking, a second prosecutor
entered the courtroom and tendered a stay order issued by the court
of appeals. The district judge then halted the proceedings and
excused the jury temporarily. After we issued a further stay and
set an expedited briefing schedule, the judge excused the jury sinedie.
III. APPELLATE JURISDICTION
 The threshold question presented for our appraisal
involves Brooks's claim that we lack jurisdiction to hear and
determine this interlocutory appeal. Answering this question
requires us to construe 18 U.S.C. 3731, the statute that
regulates the form and timing of government appeals from certain
pretrial evidentiary rulings in criminal cases. Section 3731
confers a right to an immediate appeal if the district court, in a
pretrial ruling, bars the government's use of particular evidence,
and the United States Attorney files a timely notice of appeal
accompanied by the requisite certification. See United States v.
Barletta, 644 F.2d 50, 53 n.1 (1st Cir. 1981).
 Despite Brooks's importuning, we conclude, without
serious question, that these criteria were satisfied in the instant
case. The challenged pretrial order extirpated evidence that the
government considered to be "substantial proof" of specified
elements of the charged offenses, and the United States Attorney so
certified. The link forged in the certificate between the excluded
evidence and the crimes charged is not implausible. See, e.g.,
United States v. Scivola, 766 F.2d 37, 44 (1st Cir. 1985)
(discussing crime of perjury); United States v. Cintolo, 818 F.2d
980, 990-93 (1st Cir. 1987) (discussing crime of obstruction of
justice). Moreover, both the challenged ruling and the
government's appeal from it, appending the required certificate,
occurred before jeopardy attached. See, e.g., United States v.
Brand, 80 F.3d 560, 568 (1st Cir. 1996) (explaining that jeopardy
typically attaches when a trial jury is sworn), cert. denied, 117
S. Ct. 737 (1997). No more is exigible under section 3731. SeeUnited States v. McKoy, 78 F.3d 446, 449 (9th Cir.), cert. denied,
117 S. Ct. 67 (1996).
 In reaching this conclusion, we reject out of hand
Brooks's assertion that a ruling on a motion in limine is a stopgap
order of the trial court and, as such, should be distinguished from
a suppression order for purposes of section 3731. In drawing the
distinction between appealable and non-appealable pretrial orders,
labels are unhelpful. Sometimes a district court, faced with a
pretrial motion in limine, will temporize, see, e.g., United States 
v. Holmquist, 36 F.3d 154, 163-64 (1st Cir. 1994), and the
resultant order, depending on the degree of finality associated
with it, may or may not qualify as an order excluding evidence
under section 3731. But such theoretical possibilities have no
bearing here, for Judge Harrington's ruling constitutes an
unqualified preclusion. An order that grants a motion in limine
with such a degree of finality falls squarely within the statutory
sweep. See United States v. Lecompte, 131 F.3d 767, 768 (8th Cir.
1997); United States v. Lachman, 48 F.3d 586, 590 (1st Cir. 1995);
United States v. King, 827 F.2d 866-67 (1st Cir. 1987); see also S.
Rep. No. 91-1296, at 18 (1970) (stating that Congress intended
section 3731 "to be liberally construed so as to effectuate its
purpose of permitting the Government to appeal . . . from all
suppression and exclusions of evidence in criminal proceedings,
except those ordered during trial"). In other words, pretrial
orders that have the practical effect of excluding material
evidence at trial are appealable under section 3731, regardless of
nomenclature, and Judge Harrington's preclusory order is of this
genre.
 Brooks's second jurisdictional argument is no more
persuasive. Citing a line of cases that hold that the government
may not appeal under section 3731 if its appeal will interrupt an
ongoing trial, see, e.g., United States v. Kington, 801 F.2d 733,
735 (5th Cir. 1986); United States v. Harshaw, 705 F.2d 317, 319
(8th Cir. 1983), Brooks brands the government's appeal as untimely
because the district court swore the jury and started the trial
before the court of appeals stayed all proceedings. Here,
however, the prosecution noticed the appeal before the trial
started, and it is the filing of the notice of appeal, rather than
the issuance of a stay, that marks the point at which an appeal is
taken. See Griggs v. Provident Consumer Discount Co., 459 U.S. 56,
58 (1982) ("The filing of a notice of appeal is an event of
jurisdictional significance it confers jurisdiction on the court
of appeals and divests the district court of its control over those
aspects of the case involved in the appeal."). Because the
government lodged the appeal, in proper form, prior to jury
empanelment, the appeal is timely and falls within the appellate
jurisdiction conferred by 18 U.S.C. 3731. See United States v.
Mavrokordatos, 933 F.2d 843, 846 (10th Cir. 1991). The fact that
the appeal pretermitted a subsequently commenced trial that was
ongoing solely because the judge inexplicably insisted on
commencing the trial after he had notice of the government's appeal
is not sufficient to defeat the government's statutory right of
appeal. The trial never should have begun (and was, therefore, a
nullity).
IV. THE EVIDENTIARY RULING
 Having concluded that the instant appeal is properly
before us, we briefly address its substance. We review the
district court's evidentiary decision, made pursuant to Fed. R.
Evid. 403, for abuse of discretion. See United States v.
Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989). This is
ordinarily a forgiving standard, but the present circumstances are
far from ordinary: the evidentiary question is highly nuanced; the
correct answer is not self-evident; the lower court ruled without
giving the government an opportunity to file an opposition; the
court refused for no readily apparent reason to permit the
government to be heard; and the court made no specific findings. 
This concatenation of circumstances calls the district court's
hair-trigger evidentiary determination into serious question so
much so as to warrant a conclusion that the district court abused
its discretion. See In re Paoli R.R. Yard PCB Litig., 916 F.2d
829, 836 (3d Cir. 1990) (finding abuse of discretion when the trial
court failed to give plaintiffs a chance to present their
arguments, ruled on an insufficient factual record, and did not
provide a reasoned explanation for its evidentiary ruling); seealso United States v. Roberts, 978 F.2d 17, 24-25 (1st Cir. 1992)
(indicating that trial court's conduct in making a judicial
determination can constitute, or contribute to, an abuse of
discretion).
 We do not reach this conclusion merely because the judge
ruled on the spot. Speed is often a virtue, and many pretrial
rulings can be made instantaneously, or nearly so. Still, not all
situations are straightforward. In this instance, Brooks's motion
was far from a clear-cut winner, and the celerity with which the
district court acted precluded reasoned consideration (after all,
the judge never listened to the government's side of the story) and
the development of a satisfactory record.
 Nothing illustrates this reality more poignantly than the
voluminous factual proffers that the litigants have made in this
court (the government by elaborate extra-record footnotes to its
briefs and Brooks by a motion to supplement the record). The
proper functions of an appellate court and a trial court differ
significantly and appellate courts have a well-founded
institutional reluctance to step outside their wonted role to weigh
facts and arguments that were never presented to the trial court. 
See, e.g., United States v. Vaknin, 112 F.3d 579, 591 (1st Cir.
1997); Perkins v. LeFevre, 642 F.2d 37, 41 (2d Cir. 1981). Here,
moreover, the record's sparseness is not the only red flag. The
arbitrary manner in which the judge proceeded furnishes a
complementary reason, powerful in itself, for securing a more
measured exploration of the evidentiary question.
 For these reasons, we believe that we have no principled
choice but to vacate the challenged ruling and remand for a full
and orderly consideration of this seemingly critical evidentiary
point. In charting this course, we intimate no view of the proper
disposition of the sixth in limine motion, as that is for the
district court in the first instance.
V. PROCEEDINGS ON REMAND
 Our journey is not yet at an end, for the parties dispute
the proper post-remand posture of the case. Brooks says, in
effect, that although the filing of the appeal may have divested
the trial court of authority in respect to the contested
evidentiary ruling, the court nonetheless retained the power to
continue with jury selection and empanelment (including
administration of the oath to the jurors). Thus, in Brooks's view,
jeopardy has attached and the trial that is already in progress
must proceed before the previously selected jury. The government
strenuously disagrees. It posits that the filing of the appeal
divested the district court of any and all authority over the case,
and that, therefore, Judge Harrington's subsequent actions
(including swearing the jury) are null and void. The government
also wishes us to direct that the case proceed before a fresh
judge. Brooks calls this "judge-shopping," lauds Judge Harrington,
and suggests that fulfilling the government's wish would be a grave
mistake.
 A. Retained Authority.
 To resolve the first of these conflicts, we must map the
contours of the authority (if any) that a district court retains
once the government properly notices an interlocutory appeal under
18 U.S.C. 3731, and then apply that revealed knowledge to the
case at bar. We begin with accepted doctrine: as a general rule,
the filing of a notice of appeal "divests a district court of
authority to proceed with respect to any matter touching upon, or
involved in, the appeal." United States v. Mala, 7 F.3d 1058, 1061
(1st Cir. 1993). Though judicially spawned, not legislatively
ordained, this rule has sturdy roots. See, e.g., Marrese v.
American Academy of Orthopaedic Surgeons, 470 U.S. 373, 379 (1985);
United States v. Distasio, 820 F.2d 20, 23 (1st Cir. 1987); seealso 20 James Wm. Moore et al., Moore's Federal Practice 
303.32[1] (3d ed. 1998). It derives from the notion that shared
jurisdiction almost always portends a potential for conflict and
confusion, see United States v. Ienco, 126 F.3d 1016, 1018 (7th
Cir. 1997), and although there has been some movement in the
direction of a more flexible approach, see 9A C. Wright, A. Miller
& E. Cooper, Federal Practice and Procedure 3949.1, at 45 n.23
(2d ed. 1996), the principle that jurisdiction over a single case
ordinarily should reside in a single court at any single point in
time still has widespread applicability, see Griggs, 459 U.S. at
58; Apostol v. Gallion, 870 F.2d 1335, 1337 (7th Cir. 1989). 
Allowing more than one court to take charge of a case at any given
moment often disserves the interests of comity and judicial
economy. See Shewchun v. United States, 797 F.2d 941, 943 (11th
Cir. 1986).
 Like most rules, the rule that either the trial or the
appellate court but not both may have jurisdiction over a case
at any given point in time admits of some exceptions. Thus, a
district court can proceed, notwithstanding the filing of an
appeal, if the notice of appeal is defective in some substantial
and easily discernible way (if, for example, it is based on an
unappealable order) or if it otherwise constitutes a transparently
frivolous attempt to impede the progress of the case. See Kusay v.
United States, 62 F.3d 192, 194 (7th Cir. 1995); Mala, 7 F.3d at
1061.
 Brooks labors to bring himself within the confines of
this exception. First, he asserts that the government's appeal is
frivolous (or, at least, that Judge Harrington treated it as
frivolous and therefore was entitled to proceed). We are not
persuaded. The district court's preclusory order is plainly
appealable and the record contains nothing that would justify a
finding of frivolousness. Furthermore, Brooks has not attacked
the certification that accompanied the appeal and that
certification appears regular on its face. Finally, the
circumstances belie any suggestion that the prosecution harbored
dilatory motives.
 Ably represented, Brooks introduces another, potentially
more nettlesome notion the principle of shared jurisdiction. The
black-letter rule that the filing of a notice of appeal transfers
authority over the case from the trial court to the court of
appeals derives from a desire to prevent clashes between
institutions that occupy different tiers within the federal
judicial system. Thus, the trial court may continue to exercise a
modicum of power over a case that is before the appellate court 
but this power exists only in those few situations in which the
risk of an intermural collision is small. See Ienco, 126 F.3d at
1018; Kusay, 62 F.3d at 194. Brooks asseverates that the district
court's actions in this case come within the narrow ambit of this
shared jurisdiction.
 By its nature, any suggestion of shared jurisdiction is
sensitive and, thus, the administration of this principle requires
a delicate touch. At most, shared jurisdiction flourishes in a
circumscribed cluster of situations, the handling of which is not
inconsistent with the prosecution of an appeal. See United Statesv. Hurley, 63 F.3d 1, 23 (1st Cir. 1995). These situations include
the processing of such peripheral or ancillary aspects of the case
as motions for counsel fees, see In re Nineteen Appeals, 982 F.2d
603, 609 n.10 (1st Cir. 1992); actions "in aid of execution of a
judgment that has been appealed and not stayed," Hurley, 63 F.3d at
23; and orders relating to procedures "in aid of the appeal,"
Spound v. Mohasco Indus., Inc., 534 F.2d 404, 411 (1st Cir. 1976)
(internal quotation marks omitted).
 Of course, these examples have limited relevance in terms
of section 3731. Appeals under that statute are by definition
predicated on specific evidentiary rulings and thus the taking of
a section 3731 appeal may not necessitate a wholesale surrender of
the trial court's jurisdiction. See Ienco, 126 F.3d at 1018. In
the end, each section 3731 case is sui generis as it relates to the
possibility of shared jurisdiction. The specific question that
must be answered today is whether a district court, after it
receives notice of a properly filed section 3731 appeal,
nonetheless may swear a jury and start the trial. We think not.
 The swearing of a jury is a matter of enormous
consequence to both the prosecution and the defense in a criminal
case. Moreover, jury empanelment initiates the trial, and jeopardy
attaches when the jury is sworn. See Brand, 80 F.3d at 568; United
States v. Pierce, 60 F.3d 886, 889 (1st Cir. 1995). This activity
goes well beyond mere preparation for trial, and engaging in it
while an appeal from a preclusory order is pending undermines the
primary goal of section 3731. After all, Congress crafted section
3731 specifically to permit the resolution of evidentiary appeals
before the commencement of trial. See Harshaw, 705 F.2d at 319
(discussing history of 18 U.S.C. 3731). Whatever residual
authority remains with a district judge to continue preparations
for trial once the government launches a section 3731 appeal, the
court retains no power to swear a jury and begin the trial during
the pendency of such an appeal. Accord Mavrokordatos, 933 F.2d at
846.
 United States v. Gatto, 763 F.2d 1040 (9th Cir. 1985),
much relied upon by Brooks, does not require a contrary result. In
Gatto the district court excluded evidence a few days before trial
as a sanction, holding that the prosecution's tardy document
production transgressed the court's discovery order. See id. at
1043-44. The government appealed pursuant to section 3731. After
the district judge declined to stay or adjourn the trial, the
government refused to go forward and the judge dismissed the
indictment for failure to prosecute. See id. at 1044.
 Brooks touts Gatto not for its holding the Ninth
Circuit reversed, finding an abuse of discretion, see id. at 1051
 but for its dictum. The Gatto court at one point observed that
"a district court retains the naked power, in appropriate cases, to
dismiss an indictment while a section 3731 appeal from a pretrial
order is pending." Id. at 1049 (citation and internal quotation
marks omitted). From this dictum, Brooks reasons that if a nisi
prius court retains the authority to dismiss a case entirely after
a section 3731 appeal has been perfected, then, surely, the court
retains the power to begin the trial by selecting a jury. Brooks's
view is much too sanguine.
 There are substantial differences between the dismissal
of an indictment as a sanction, before jeopardy attaches, and
bringing jeopardy into play by swearing a jury and thus initiating
the trial proper. In the former circumstance, the court's ruling
is at least arguably collateral and does not clash directly with
the fundamental objectives of section 3731. In the latter
circumstance, however, the trial court's action serves to frustrate
the core purpose of section 3731, forcing the government to try the
case without a substantial piece of evidence. See United States v.
Kelly, 683 F. Supp. 251, 254 n.5 (S.D. Fla. 1988). Given these
salient distinctions, Gatto simply cannot be read as authority for
the district court's swearing of a jury while a section 3731 appeal
pends.
 To summarize, we hold that the filing of a proper notice
of appeal pursuant to section 3731 divests the district court of
its authority to swear a jury and start the trial. SeeMavrokordatos, 933 F.2d at 846; see also Kusay, 62 F.3d at 194
(explaining that, during the pendency of a section 3731 appeal, the
district court lacks jurisdiction to perform any activity that
"cannot be described as an ancillary or unrelated matter"). No
separate stay is necessary. This means, of course, that the
actions taken by Judge Harrington subsequent to the docketing of
the government's appeal were nullities. On remand, the slate must
be wiped clean, the jurors discharged, and a new jury selected and
sworn.
 B. The Request for Removal.
 The government, over Brooks's vigorous opposition,
entreats us to oust Judge Harrington from the case and remand to a
different trier. It maintains that the judge has dug in his heels
and that the heavy-handed manner in which he brushed aside the
government's attempt to exercise its rights under section 3731
renders his continued participation in the case problematic. These
are serious accusations, and we treat them as such.
 In resolving this contretemps, we evaluate the judge's
actions "according to a standard of fairness and impartiality,
recognizing that each case tends to be fact-specific." United
States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988) (citations and
internal quotation marks omitted). We apply this standard mindful
that judges must not only be scrupulously fair in the
administration of justice, but also must foster an aura of
fairness. See Offutt v. United States, 348 U.S. 11, 14 (1954)
(admonishing that "justice must satisfy the appearance of
justice"); see generally United States v. Balistrieri, 779 F.2d
1191, 1204 (7th Cir. 1985) (examining the legislative history of 28
U.S.C. 455(a) the recusal statute and stating that this
statute "is directed against the appearance of partiality, whether
or not the judge is actually biased") (emphasis in original).
 Approaching the record from this standpoint, we take a
practical, commonsense view of what transpired below. In the
process, we grant the judge a "margin of humanity." Polito, 856
F.2d at 418. Presiding over a hotly contested trial is not a
pastime for the faint of heart, and a trial judge, under fire,
cannot be expected to function either as a saint or as a bloodless
automaton. See id. Despite these allowances, however, we are
persuaded that the judge's conduct in this case went well beyond
the pale.
 We see nothing to be gained from exegetic treatment of
this point. We have set out at considerable length the relevant
portions of the transcript chronicling the events surrounding this
appeal See supra Part II. Taken alone, the judge's adamant
refusal to hear the government and his intransigence in pushing
forward with the case despite the loss of jurisdiction would give
us pause. Those events are all the more unsettling here because of
the judge's intemperate treatment of counsel. The government, as
well as the defendant, deserves a fair trial, and, given the
historical record, continuing the case before the same jurist would
run an unacceptably high risk of shrouding the trial in an aura of
partiality. Consequently, we grant the government's request,
remove Judge Harrington from further participation in the case, and
direct that the case be assigned, on remand, to a different
district judge.
VI. CONCLUSION
 We need go no further. For the reasons stated herein, we
vacate the order granting Brooks's sixth motion in limine and
remand the case to the district court for further proceedings
before a new trier (who, among other things, shall discharge the
previously empaneled jury). We add, moreover, that the newly
designated district judge shall be free, on remand, if he or she
chooses to do so, to revisit any earlier ruling in the case
(including but not limited to the disposition of the first five in
limine motions). See Flibotte v. Pennsylvania Truck Lines, Inc.,
131 F.3d 21, 25 (1st Cir. 1997), cert. denied, 66 U.S.L.W. 3720
(U.S. May 18, 1998) (No. 97-1736).

So Ordered.